**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

FILED JULY 30, 2012

S T A T E   O F   M I C H I G A N

SUPREME COURT

JAMES DOUGLAS,

     Plaintiff-Appellee,

v                               No. 143503

ALLSTATE INSURANCE COMPANY,

     Defendant-Appellant.

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

Under the terms of the no-fault act,[1] a person injured in a motor vehicle accident is entitled to recover personal protection insurance (PIP) benefits for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."[2] This case requires this Court to consider whether the services provided by plaintiff's wife

---

[1] MCL 500.3101 *et seq*.

[2] MCL 500.3107(1)(a).

constituted services "for an injured person's care," whether the Court of Appeals properly remanded this case to the circuit court for findings of fact regarding the extent to which expenses for services for plaintiff's care were actually incurred, and whether the circuit court erred by awarding an hourly rate that corporate agencies charge for rendering services, rather than an hourly rate that individual caregivers receive for those services.

We hold that "allowable expenses" must be "*for* an injured person's care, recovery, or rehabilitation."[3] Accordingly, a fact-finder must examine whether attendant care services are "necessitated by the injury sustained in the motor vehicle accident" before compensating an injured person for them.[4]  However, the services cannot simply be "'[o]rdinary household tasks,'" which are not *for* the injured person's care.[5] Moreover, because an allowable expense consists of a "charge[]"[6] that "'must be incurred,'"[7] an injured person who seeks reimbursement for any attendant care services must prove by a preponderance of the evidence not only the amount and nature of the services rendered, but also the caregiver's expectation of compensation or reimbursement for providing the attendant care.  Because the no-fault act does not create different

---

[3] *Id*. (emphasis added).

[4] *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 535; 697 NW2d 895 (2005).

[5] *Visconti v DAIIE*, 90 Mich App 477, 481; 282 NW2d 360 (1979), quoting *Kushay v Sexton Dairy Co*, 394 Mich 69, 74; 228 NW2d 205 (1975).

[6] MCL 500.3107(1)(a).

[7] *Griffith*, 472 Mich at 532 n 8, quoting *Manley v DAIIE*, 425 Mich 140, 169; 388 NW2d 216 (1986) (BOYLE, J., concurring in part).

2

standards depending on who provides the services, this requirement applies equally to services that a family member provides and services that an unrelated caregiver provides.

If the fact-finder concludes that a plaintiff incurred allowable expenses in receiving care from a family member, the fact-finder must also determine to what extent any claimed expense is a "reasonable charge[]."[8] While it is appropriate for the fact-finder to consider hourly rates charged by individual caregivers when selling their services (whether to their employers that commercially provide those services or directly to injured persons), comparison of hourly rates charged by commercial caregiving agencies is far too attenuated from an individual's charge for the fact-finder simply to adopt that agency charge as an individual's reasonable charge.

In applying these principles of law to the facts of this case, we hold that the Court of Appeals correctly determined that plaintiff may recover "allowable expenses" to the extent that they encompass services that are reasonably necessary for plaintiff's care when the care is "related to [plaintiff's] injuries."[9] However, because the circuit court erred by awarding damages for allowable expenses without requiring proof that the underlying charges were actually incurred, we agree with the decision of the Court of Appeals to remand this case to the circuit court for a determination whether charges for allowable expenses were actually incurred. Nevertheless, we also conclude that the Court of Appeals erred to the extent that its decision limited the scope of the determination on remand to the period after November 7, 2006. Instead, the circuit court must reexamine

---

[8] MCL 500.3107(1)(a).

[9] *Griffith*, 472 Mich at 534.

3

on remand the evidentiary proofs supporting the entire award. While we reject defendant's request for a verdict of no cause of action because there remain unresolved questions of fact, we caution the circuit court that a fact-finder can only award benefits that are proved to have been incurred. Finally, in determining the hourly rate for attendant care services, the circuit court clearly erred by ruling that plaintiff is entitled to an hourly rate of $40 for attendant care services because that rate is entirely inconsistent with the evidence of an individual's rate of compensation, including the compensation that Katherine Douglas, plaintiff's wife, actually received as an employee hired to care for plaintiff. We reverse the judgment of the Court of Appeals on this issue. Therefore, we affirm in part, reverse in part, vacate the award of attendant care benefits, and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In 1996, plaintiff, James Douglas, sustained a severe closed-head brain injury when a hit-and-run motorist struck the bicycle he was riding. Plaintiff was hospitalized for approximately one month after the accident and received therapy and rehabilitation after his discharge. Because the driver of the motor vehicle that struck plaintiff could not be identified, plaintiff sought assignment of a first-party insurance provider through the Michigan Assigned Claims Facility.[10] The facility assigned defendant, Allstate Insurance

---

[10] MCL 500.3172(1) provides that

> [a] person entitled to claim because of accidental bodily injury arising out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle in this state may obtain personal protection insurance benefits through an assigned claims plan if no personal protection insurance

4

Company, to plaintiff's claim. In the three years after the accident, defendant paid plaintiff PIP benefits for his hospitalization, medical expenses, wage loss, and attendant care, as well as for replacement services, in accordance with the no-fault act. Defendant claims that plaintiff did not seek additional PIP benefits after 1999 until he filed the instant lawsuit in 2005.

In 1999, plaintiff began the first of a series of full-time jobs. However, he was unable to hold a job for very long, and he eventually stopped working. During this time, he twice attempted suicide. After the second suicide attempt, a 2005 letter written by plaintiff's psychiatrist indicated that plaintiff "requires further treatment" because he "continues to suffer from ill-effects as a result of his closed-head injury . . . ." In particular, the psychiatrist emphasized that plaintiff suffered from short-term memory problems and impulsivity as a result of the accident and explained that plaintiff "should have the opportunity to obtain the care that will most likely restore him to a good level of functioning." Defendant claims that it did not receive this letter before plaintiff initiated this lawsuit.

Plaintiff filed the instant lawsuit on May 31, 2005, in the Washtenaw Circuit Court seeking compensation for unspecified PIP benefits that defendant "has refused or is expected to refuse to pay . . . ."[11] Defendant filed three successive dispositive motions,

_____

is applicable to the injury, [or] no personal protection insurance applicable to the injury can be identified . . . .

[11] Because defendant paid PIP benefits for medical bills during the pendency of the suit, the only potential PIP benefits at issue were the services that plaintiff's wife provided.

only the first of which was granted.[12]  Relevant here, the second motion for summary disposition claimed that attendant care was not reasonably necessary because none of plaintiff's medical providers had prescribed attendant care for plaintiff.  The circuit court denied the motion without prejudice in advance of further discovery.  The third motion for partial summary disposition claimed that plaintiff could not recover for attendant care services provided before November 7, 2006, because plaintiff's treating psychologist, Dr. Thomas Rosenbaum, neither authorized nor prescribed attendant care services before that date.  In opposing the motion, plaintiff offered an affidavit from Dr. Rosenbaum, which stated that plaintiff "is in need of aide care during all waking hours" and that Katherine Douglas "has been providing her husband with aide care, while the two of them are together, since the motor vehicle accident."  After hearing oral argument, the circuit court denied defendant's third motion, ruling that Dr. Rosenbaum's affidavit created a question of fact that precluded partial summary disposition.

The parties proceeded to a bench trial on the claim for attendant care services that Mrs. Douglas allegedly provided.  Defendant's claims adjuster testified during plaintiff's case-in-chief as an adverse witness.  This witness agreed with plaintiff's counsel that plaintiff "would have needed [attendant care] back when the lawsuit first began" in 2005

---

[12] The first motion for partial summary disposition claimed that MCL 500.3145(1) barred any portion of plaintiff's claim that accrued more than one year before plaintiff commenced the suit, that is, before May 31, 2004.  The circuit court granted defendant's motion for partial summary disposition with the consent of the parties.  See MCL 500.3145(1), which states, in relevant part, that a claimant "may not recover [PIP] benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

6

and that "it would be appropriate to pay Mrs. Douglas for some of [the] care that she provides . . . at home[.]" However, on direct examination by defendant's counsel, the claims adjuster testified that there was no evidence that any compensable care had actually been provided to plaintiff.

Katherine Douglas testified that when she was at home, her entire time was spent "babysitting" and "watching James," even while she was performing other household chores. She believed that her presence in the house kept plaintiff from being hospitalized or incarcerated. She also testified about a series of forms, each labeled "AFFIDAVIT OF ATTENDANT CARE SERVICES," all dated June 25, 2007, covering each month between November 2004 and June 2007. These forms totaled up the number of hours during which she claimed to have provided services and outlined the various tasks that she performed, including organizing her family's day-to-day life, cooking meals, undertaking daily chores, maintaining the family's house and yard, ordering and monitoring plaintiff's medications, communicating with health care providers and Social Security Administration officials, calling plaintiff from work to ensure plaintiff's safety, monitoring plaintiff's safety, and cueing or prompting various tasks for plaintiff to undertake. However, she admitted that the forms were all completed in June 2007, that she did not contemporaneously itemize the amount of time she spent on any particular item, and that in completing the forms, she went through household bills to reconstruct what had occurred in her life during the relevant period.

Dr. Rosenbaum testified that he began treating plaintiff on November 7, 2006, and recommended that Mrs. Douglas provide attendant care for all of plaintiff's waking

7

hours,[13] although in November 2007 he revised his recommendation to 40 hours of attendant care a week. Dr. Rosenbaum also testified that *his* company, TheraSupport, L.L.C., served as plaintiff's attendant care provider and that TheraSupport had employed Mrs. Douglas to provide her husband's attendant care. Although TheraSupport paid Mrs. Douglas $10 an hour for providing services to plaintiff, it billed plaintiff $40 an hour for those very services. Dr. Rosenbaum averred that defendant eventually paid all of TheraSupport's bills.

Defendant's medical expert, Dr. Charles Seigerman, testified that he conducted a battery of cognitive tests on plaintiff and concluded that two hours of attendant care services a day are needed to help plaintiff organize the logistics of his treatment and ensure that he takes his medicine. Dr. Seigerman also testified that an appropriate hourly rate for these services was "around $10.00 an hour," or "[p]erhaps a little higher," although he acknowledged on cross-examination that he was not an expert on the appropriate rate of compensation for this service.

The circuit court awarded PIP benefits to plaintiff, explaining that he "needs aide care for all of his waking hours." The circuit court calculated that plaintiff was entitled to a total of 67 hours a week of attendant care for the period between May 31, 2004, and November 1, 2007, and 40 hours a week after November 1, 2007.[14] The court established

---

[13] Dr. Rosenbaum also noted that another of plaintiff's medical providers had recommended in 1997 that plaintiff receive 24-hour supervisory care.

[14] The 67-hour week corresponded to 7 hours each weekday and 32 hours during the weekend (16 hours each on Saturday and Sunday), while the 40-hour week corresponded to Dr. Rosenbaum's subsequent recommendation.

8

a $40 hourly rate for those services. The judgment entered on November 18, 2009, and totaled $1,163,395.40, which included attorney fees, no-fault interest, costs, and judgment interest.

The Court of Appeals affirmed in part, reversed in part, and remanded for further proceedings. First, the panel rejected defendant's claim that the circuit court had erred by denying its final two motions for summary disposition. In particular, the panel concluded that Dr. Rosenbaum's affidavit created a question of fact regarding whether attendant care services were "reasonably necessary" for the period before Dr. Rosenbaum began treating plaintiff on November 7, 2006.[15] The panel also rejected defendant's claim that the circuit court had erred by awarding plaintiff benefits for replacement services because the award "was not intended to compensate Katherine for her mere presence in the home," but instead was intended to compensate for "plaintiff['s] required supervision," and "Katherine was the appropriate person to provide it."[16]

The Court of Appeals reversed the circuit court's award, however, because "the trial evidence in this case did not reflect that Katherine maintained records of her claimed attendant care."[17] Although Mrs. Douglas had submitted several forms, each labeled "AFFIDAVIT OF ATTENDANT CARE SERVICES," the panel concluded that when the descriptions on the forms had not been "left blank," they were "vague" and only

---

[15] MCL 500.3107(1)(a).

[16] *Douglas v Allstate Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued June 23, 2011 (Docket No. 295484), p 5.

[17] *Id.* at 6.

9

constituted "an effort to reconstruct her time."[18]  Thus, the panel remanded for further

proceedings "regarding the amount of incurred expenses for attendant care from

November 7, 2006, to November 18, 2009," and to determine "whether Katherine

reasonably expected compensation at the time of performance."[19]  Finally, the panel

upheld the circuit court's $40 hourly rate because that rate "is supported by Rosenbaum's

testimony regarding the rate charged by his TheraSupport program for attendant care and

also the testimony of defendant's adjuster regarding rates charged by commercial

agencies for home attendant care."[20]

This Court granted defendant's application for leave to appeal and ordered the

parties to brief the following issues:

> (1) whether the Court of Appeals erred in remanding this case to the trial court for further proceedings regarding the amount of incurred expenses for attendant care from November 7, 2006, to November 18, 2009, after finding that the trial court clearly erred in awarding attendant care benefits to the plaintiff without requiring sufficient documentation to support the daily and weekly hours underlying the award; (2) whether the plaintiff presented sufficient proofs at trial to support the trial court's award of attendant care benefits for the period before November 7, 2006; (3) whether activities performed by Katherine Douglas constituted attendant care under MCL 500.3107(1)(a) or replacement services under MCL 500.3107(1)(c); and (4) whether the trial court clearly erred in awarding attendant care benefits at the rate of $40 per hour.[21]

---

[18] *Id.* at 6-7.

[19] *Id.* at 7.

[20] *Id.*

[21] *Douglas v Allstate Ins Co*, 490 Mich 927 (2011).

10

## II. STANDARD OF REVIEW

This case involves the interpretation of the no-fault act. "Issues of statutory interpretation are questions of law that this Court reviews de novo."[22] When interpreting a statute, we must "ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute."[23] This requires courts to consider "the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'"[24] If the statutory language is unambiguous, "the Legislature's intent is clear and judicial construction is neither necessary nor permitted."[25]

We review de novo the denial of a motion for summary disposition.[26] A motion for summary disposition under MCR 2.116(C)(10) requires the reviewing court to consider "the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party. Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law."[27]

---

[22] *Griffith*, 472 Mich at 525-526.

[23] *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002).

[24] *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

[25] *Griffith*, 472 Mich at 526, citing *Koontz*, 466 Mich at 312.

[26] *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

[27] *Brown v Brown*, 478 Mich 545, 551-552; 739 NW2d 313 (2007).

11

In civil actions tried without a jury, MCR 2.517(A)(1) requires the court to "find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment." We review these findings of fact for clear error,[28] which occurs when "'the reviewing court is left with a definite and firm conviction that a mistake has been made.'"[29]

## III. ANALYSIS

### A. LEGAL BACKGROUND OF THE NO-FAULT ACT

MCL 500.3105(1) establishes that a personal protection insurance provider is liable under the no-fault act "to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter." Accordingly, MCL 500.3105(1) imposes two threshold causation requirements for PIP benefits:

> First, an insurer is liable only if benefits are "*for* accidental bodily injury . . . ." "[F]or" implies a causal connection. "[A]ccidental bodily injury" therefore triggers an insurer's liability and defines the scope of that liability. Accordingly, a no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are causally connected to the accidental bodily injury arising out of an automobile accident.

> Second, an insurer is liable to pay benefits for accidental bodily injury only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ." It is not *any* bodily injury that triggers an insurer's liability under the no-fault act.

---

[28] MCR 2.613(C); *Adams Outdoor Advertising, Inc v City of Holland*, 463 Mich 675, 681; 625 NW2d 377 (2001).

[29] *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008), quoting *Kitchen v Kitchen*, 465 Mich 654, 661-662; 641 NW2d 245 (2002).

12

Rather, it is only those injuries that are caused by the insured's use of a motor vehicle.[30]

MCL 500.3107(1) further limits what benefits are compensable as PIP benefits, allowing unlimited lifetime benefits for "allowable expenses" but limiting "ordinary and necessary services" to a three-year period after the accident and to a $20 daily limit:

> Except as provided in subsection (2), personal protection insurance benefits are payable for the following:
>
> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. . . .
>
> \* \* \*
>
> (c) Expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and necessary services in lieu of those that, if he or she had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or herself or of his or her dependent.

This Court's decision in *Johnson v Recca* clarified that the "ordinary and necessary services" contemplated in subsection (1)(c)—commonly referred to as "replacement services"—constitute a category of expenses distinct from the "allowable expenses" contemplated in subsection (1)(a).[31]

This case requires this Court to consider whether the specific services at issue here were "allowable expenses"[32] or whether they were replacement services.[33] The

---

[30] *Griffith*, 472 Mich at 531 (alterations in original).

[31] *Johnson v Recca*, 492 Mich ___; ___ NW2d ___ (Docket No. 143088, issued July 30, 2012).

[32] MCL 500.3107(1)(a).

[33] MCL 500.3107(1)(c).

distinction between allowable expenses and replacement services is important in this case because the operation of the one-year-back rule, MCL 500.3145(1), prevents plaintiff from recovering benefits for otherwise allowable expenses incurred more than one year before the filing of the lawsuit. Thus, plaintiff cannot recover benefits for otherwise allowable expenses incurred before May 31, 2004, which was nearly eight years after plaintiff's July 1996 accident. Because recovery for replacement services is limited to those services provided in the first three years after the accident, plaintiff cannot recover any benefits for replacement services. Accordingly, in this case, plaintiff can only recover benefits for services to the extent that the services were allowable expenses within the meaning of MCL 500.3107(1)(a) and incurred after May 31, 2004. It is to the definition of "allowable expenses" that we now turn.

## B. ALLOWABLE EXPENSES

MCL 500.3107(1)(a) defines "allowable expenses" as "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." We have recognized that the plain language of this provision imposes four requirements that a PIP claimant must prove before recovering benefits for allowable expenses: (1) the expense must be for an injured person's care, recovery, or rehabilitation, (2) the expense must be reasonably necessary, (3) the expense must be incurred, and (4) the charge must be reasonable.[34] We will address these requirements seriatim as we apply them to the facts of this case.

---

[34] See *Griffith*, 472 Mich at 532 n 8.

14

1. SERVICES "FOR" AN INSURED'S CARE, RECOVERY, OR REHABILITATION

MCL 500.3107(1)(a) requires that allowable expenses must be "for an injured person's care, recovery, or rehabilitation." As we explained in *Griffith v State Farm Mutual Automobile Insurance Co*, "expenses for 'recovery' or 'rehabilitation' are costs expended in order to bring an insured to a condition of health or ability sufficient to resume his preinjury life," while expenses for "care" "may not restore a person to his preinjury state."[35] While the dictionary definition of "care" "can be broadly construed to encompass *anything* that is reasonably necessary to the provision of a person's protection or charge,"[36] because MCL 500.3107(1)(a) "specifically limits compensation to charges for products or services that are reasonably necessary for an *injured person's* care, recovery, or rehabilitation[,] . . . [t]his context suggests that 'care' must be related to the insured's injuries."[37] In comparing the definition of "care" to the definitions of "recovery" and "rehabilitation," we concluded that

> "[c]are" must have a meaning that is broader than "recovery" and "rehabilitation" but is not so broad as to render those terms nugatory. . . . "[R]ecovery" and "rehabilitation" refer to an underlying injury; likewise, the statute as a whole applies only to "an injured person." It follows that the Legislature intended to limit the scope of the term "care" to expenses for those products, services, or accommodations whose provision is necessitated by the injury sustained in the motor vehicle accident. "Care" is broader than "recovery" and "rehabilitation" because it may encompass expenses for products, services, and accommodations that are necessary

---

[35] *Id.* at 535.

[36] *Id.* at 533.

[37] *Id.* at 534 (quotation marks omitted).

because of the accident but that may not restore a person to his preinjury state.[38]

We reaffirm here *Griffith*'s definition of "care" as it relates to the scope of allowable expenses: although services for an insured's care need not restore a person to his preinjury state, the services must be related to the insured's injuries to be considered allowable expenses.

In analyzing this requirement as applied to the particular services claimed in this case, we note that prior panels of the Court of Appeals examined the extent to which a family member's services can be considered allowable expenses under the no-fault act. In *Visconti v Detroit Automobile Inter-Insurance Exchange*, the panel analogized no-fault benefits to worker's compensation benefits and ruled that "'[o]rdinary household tasks'" that a family member performs are not allowable expenses, but "'[s]erving meals in bed and bathing, dressing, and escorting a disabled person are not ordinary household tasks'"[39] and can therefore be considered allowable expenses pursuant to MCL 500.3107.

A subsequent Court of Appeals panel applied *Visconti* and allowed the plaintiff to recover no-fault benefits when a family member was "required to serve his meals in bed, bathe him, escort him to the doctor's office, exercise him in conformity with his doctor's instructions, assist in formulating his diet, administer medication, and assist him with speech and associational therapy."[40] The Court also held that, even though the family

---

[38] *Id.* at 535.

[39] *Visconti*, 90 Mich App at 481, quoting *Kushay*, 394 Mich at 74.

[40] *Van Marter v American Fidelity Fire Ins Co*, 114 Mich App 171, 180; 318 NW2d 679 (1982).

16

member who provided these services was not a licensed medical care provider, "[t]he statute does not require that these services be supplied by 'trained medical personnel'."[41] In other words, while the no-fault act specifies and limits what types of expenses are compensable, it places no limitation on *who* may perform what is otherwise an allowable expense.

The statutory language of MCL 500.3107 confirms the distinction between a family member providing attendant care to an injured person—which is "for an injured person's care"[42]—and a family member providing replacement services to benefit the entire household—which are "ordinary and necessary services" that replace services that the injured person would have performed "for the benefit of himself or herself or of his or her dependent."[43] Accordingly, we reiterate this Court's recent holding in *Johnson* that replacement services as described in MCL 500.3107(1)(c) are distinct from allowable expenses under MCL 500.3107(1)(a).[44] Allowable expenses cannot be for "ordinary and necessary services" because ordinary and necessary services are not "for an injured person's care, recovery, or rehabilitation."

In this case, defendant claims that a judgment of no cause of action should be entered because Mrs. Douglas did not perform any compensable allowable expenses, only replacement services, which are not compensable in this case because of the three-

---

[41] *Id.*

[42] MCL 500.3107(1)(a).

[43] MCL 500.3107(1)(c).

[44] *Johnson*, 492 Mich at ___; slip op at 5-6.

17

year time limit of MCL 500.3107(1)(c). We disagree with defendant's claim and conclude that defendant is not entitled to relief on this issue.

Defendant is correct that Mrs. Douglas's testimony and attendant care forms indicate that she provided many services that are properly considered replacement services, including daily organization of family life; preparation of family meals; yard, house, and car maintenance; and daily chores. These services are prototypical "ordinary and necessary" services that every Michigan household must undertake.[45] While replacement services for the household might be necessitated by the injury if the injured person otherwise would have performed them himself, they are not *for* his care and therefore do not fall within the definition of allowable expenses. Nevertheless, the fact that Mrs. Douglas performed *some* replacement services does not preclude recovery for the allowable expenses that *actually were incurred*, including attendant care services. The fact that her attendant care forms list certain replacement services is not dispositive on this issue, especially given that other services listed on those forms can reasonably be considered attendant care services, including traveling to and communicating with plaintiff's medical providers and managing plaintiff's medication.

---

[45] Plaintiff also argues that while some of Mrs. Douglas's tasks might be considered replacement services, there is therapeutic value in ensuring that plaintiff is involved with these activities, although they require Mrs. Douglas's supervision. However, the testimony adduced at trial undermines this rationale because Mrs. Douglas explained that during the week, when she spent time cooking, washing dishes, cleaning the house, and caring for her children, plaintiff did "[v]ery little" to assist her in these chores, but instead often watched television.

18

The circuit court ruled that Mrs. Douglas "is Plaintiff's caretaker and basically spends her free time making sure that Plaintiff is cared for, and does not harm himself as he tried to do in a suicide attempt." This factual finding is not clearly erroneous because it is consistent with Mrs. Douglas's testimony that she was "watching James" even while she was performing household chores by herself. Furthermore, it suggests that the circuit court adopted plaintiff's argument that Mrs. Douglas's supervision constituted attendant care services.

The Court of Appeals rejected defendant's claim that Mrs. Douglas only provided replacement services and compared the claimed supervision with this state's workers' compensation caselaw that allows "on-call" supervision,[46] even when the care provider is pursuing other tasks while on call.[47] We affirm the result of the Court of Appeals on this issue and hold that defendant is not entitled to a verdict of no cause of action on the basis of its claim that Mrs. Douglas *only* provided replacement services because there was testimony given at trial that at least some of the services she said she had provided were consistent with the requirement of MCL 500.3107(1)(a) that allowable expenses be for an injured person's care as necessitated by the injury sustained in the motor vehicle accident.[48] For instance, even if Mrs. Douglas's claimed supervision of plaintiff does not

---

[46] *Morris v Detroit Bd of Ed*, 243 Mich App 189, 197; 622 NW2d 66 (2000) ("[O]n-call care is compensable under the [workers' compensation] statute.").

[47] *Brown v Eller Outdoor Advertising Co*, 111 Mich App 538, 543; 314 NW2d 685 (1981) ("The fact that Mrs. Brown might use her 'on call' time to perform household tasks does not alter the 'nature of the service provided' or the 'need' for the service.").

[48] See *Griffith*, 472 Mich at 535.

restore plaintiff to his preinjury state, testimony given at trial indicates that arguably at least some of this claimed supervision was for plaintiff's care as necessitated by the injury sustained in the motor vehicle accident and not for ordinary and necessary services that every Michigan household must undertake. Accordingly, defendant is not entitled to relief on the claim that *none* of Mrs. Douglas's claimed services could be considered attendant care services within the meaning of MCL 500.3107(1)(a).

## 2. REASONABLY NECESSARY EXPENSES

MCL 500.3107(1)(a) also requires allowable expenses to be "reasonably necessary." In *Krohn v Home-Owners Insurance Co*, this Court clarified that this requirement "must be assessed by using an objective standard."[49] Defendant questions the reasonable necessity of attendant care services for the period before November 7, 2006, because there was no medical prescription for attendant care services before that date.

Before the circuit court's ruling on defendant's third motion for summary disposition, plaintiff offered the affidavit of Dr. Rosenbaum, who explained that plaintiff "is in need of [attendant] care during all waking hours" and that Mrs. Douglas had provided that care "since [the time of] the motor vehicle accident." The circuit court based its denial of defendant's motion in part on Dr. Rosenbaum's affidavit. In reviewing that decision, the Court of Appeals determined that "the affiant relied on the statements of the parties to determine what activity plaintiff's wife engaged in during the subject period and subsequently evaluated those activities and found them to meet the

---

[49] *Krohn v Home-Owners Ins Co*, 490 Mich 145, 163; 802 NW2d 281 (2011).

20

definition of attendant care."[50] Thus, the panel held that the circuit court did not err by concluding that there were questions of fact sufficient to defeat defendant's motion for partial summary disposition. We agree with the Court of Appeals that questions of fact precluded summary disposition on this issue.

Moreover, we conclude that it was not clear error for the circuit court as fact-finder to conclude that attendant care services were, in fact, reasonably necessary for the period before November 7, 2006. There is a factual basis in the record to support the circuit court's conclusion: Dr. Rosenbaum testified at trial that, as early as 1997, plaintiff's doctors had recommended that plaintiff receive 24-hour supervision.[51] Furthermore, defendant's claims adjuster agreed with the statement of plaintiff's counsel that, if plaintiff needed attendant care services at the time of trial, "he would have needed [those services] back when the lawsuit first began[.]" This evidence was sufficient for the circuit court to conclude that because attendant care services were reasonably necessary after November 7, 2006 (a point that defendant does not dispute), they were

---

[50] *Douglas*, unpub op at 4.

[51] Although the circuit court's opinion following the trial referred to Dr. Rosenbaum's affidavit in its conclusion that attendant care services were reasonably necessary, during trial the court had sustained defendant's objection to the admission of that affidavit. However, its reason for granting defendant's objection was that the court had "heard [Dr. Rosenbaum's] live testimony." Because that live testimony clearly supports the circuit court's factual finding, and because the circuit court specifically concluded that Dr. Rosenbaum's "opinion as to the reasonable attendant care needs of [p]laintiff is both appropriate and convincing," the circuit court's error in referring to Dr. Rosenbaum's affidavit, rather than his live testimony, is harmless. See MCR 2.613(A) ("[A]n error in a ruling or order . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.").

also reasonably necessary before that date. As a result, defendant has not established that the circuit court clearly erred by concluding that plaintiff proved this element of the allowable expenses analysis.

## 3. INCURRED EXPENSES

MCL 500.3107(1)(a) also limits allowable expenses to "charges incurred." That is, even if a claimant can show that services were for his care and were reasonably necessary, an insurer "is not obliged to pay any amount except upon submission of evidence that services were *actually rendered* and of the *actual cost expended*."[52] Because an insurer's liability

> cannot be detached from the specific payments involved, or expenses incurred, . . . [w]here a plaintiff is unable to show that a particular, reasonable expense has been incurred for a reasonably necessary product and service, there can be no finding of a breach of the insurer's duty to pay that expense, and thus no finding of liability with regard to that expense.[53]

This Court has defined "incur" as it appears in MCL 500.3107(1)(a) as "'[t]o become liable or subject to, [especially] because of one's own actions.'"[54] Similarly, a "charge" is a "[p]ecuniary burden, cost" or "[a] price required or demanded for service rendered or goods supplied."[55] Thus, the statutory requirement that "charges" be

---

[52] *Manley*, 425 Mich at 159 (emphasis added); see also *Proudfoot v State Farm Mut Ins Co*, 469 Mich 476, 484; 673 NW2d 739 (2003) (holding that "[b]ecause the expenses in question were not yet 'incurred,' the Court of Appeals erred in ordering defendant to pay the total amount to the trial court" for disbursal to plaintiff as expenses are incurred).

[53] *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 50; 457 NW2d 637 (1990).

[54] *Proudfoot*, 469 Mich at 484, quoting *Webster's II New College Dictionary* (2001) (alterations in original).

[55] 1 *Shorter Oxford English Dictionary* (6th ed), p 385.

"incurred" requires some degree of liability that exists as a result of the insured's actually having received the underlying goods or services. Put differently, because a charge is something "required or demanded," the caregiver must have an expectation that she be compensated because there is no "charge[] incurred" when a good or service is provided with *no* expectation of compensation from the insurer.[56] Accordingly, this Court noted in *Burris v Allstate Insurance Co* that caregivers must have "expected compensation for their services."[57] Without the expectation of compensation, "the evidence fail[s] to establish that the plaintiff 'incurred' attendant-care expenses."[58]

---

[56] Of course, a caregiver who provides services to a family member need not present a formal bill to the family member or enter into a formal contract with that family member in order to satisfy the requirement that the caregiver have an expectation of payment from the *insurer* (although those arrangements will, of course, satisfy the evidentiary requirements). However, even in the absence of a formal bill or contract, there must be some evidence that the family member expected compensation for providing the services and of the actual services rendered. In other words, there must be some basis for a fact-finder to conclude that the caregiver had *some* expectation of compensation from the insurer, even if the expectation of compensation was not the primary motivation for providing the care. Contrary to the dissent's suggestion, a family member's determination to provide care even in the absence of an insurer's payment is not inconsistent with expecting compensation from the insurer, but the expectation must nevertheless be present for a charge to be incurred within the meaning of MCL 500.3107(1)(a). This expectation of compensation at the time the services were provided simply applies the dictionary definitions of the statutory phrase "charges incurred."

[57] *Burris v Allstate Ins Co*, 480 Mich 1081 (2008).

[58] *Id.* The dissent reintroduces the *Burris* dissent's claim that the interpretation of the word "incur" in *Proudfoot* "was limited to the facts of that case, in which the plaintiff sought advance payment for *future* expenses." *Post* at 3, citing *Burris*, 480 Mich at 1088 (WEAVER, J., dissenting). However, the *Burris* concurrence correctly explained that "[t]his factual distinction . . . is irrelevant to the *Proudfoot* Court's discussion of the meaning of the term 'incur.'" *Burris*, 480 Mich at 1084 (CORRIGAN, J., concurring). *Proudfoot* adopted the dictionary definition of the word "incur," which requires "a legal or equitable obligation to pay." *Id.* Because "there is no basis to treat family members

23

The fact that charges have been incurred can be shown "by various means," including "a contract for products and services" or "a paid bill."[59] The requirement of proof is not extinguished simply because a family member, rather than a commercial health care provider, acts as a claimant's caregiver. Indeed, MCL 500.3107(1)(a) does not distinguish a "charge[] incurred" when a family member provides care from one incurred when an unrelated medical professional provides care.[60] As a result, there is only one evidentiary standard to determine whether expenses were incurred regardless of who provided the underlying services. *Any* insured who incurs charges for services must present proof of those charges in order to establish, by a preponderance of evidence, that he is entitled to PIP benefits.[61]

---

differently than hired attendant-care-service workers . . . , the insured's family members and friends, just like any other provider, must perform the services with a reasonable expectation of payment." *Id.* at 1085. For these reasons, we reject the dissent's characterization of *Proudfoot*.

[59] *Proudfoot*, 469 Mich at 484 n 4.

[60] Because MCL 500.3107(1)(a) does not distinguish "charges incurred" for a family member's services from "charges incurred" for a professional healthcare provider's services, it is the dissent's position that lacks support in the statutory language. Put simply, "charges" must be "incurred" in order to be compensable under the no-fault act. It is this statutory language that we must consider as the expression of legislative intent because "a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 63; 642 NW2d 663 (2002).

[61] See *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 380; 670 NW2d 569 (2003) (noting the preponderance of the evidence standard for proof that an allowable expense is reasonable and necessary), aff'd 472 Mich 91 (2005).

This evidentiary requirement is most easily satisfied when an insured or a caregiver submits itemized statements, bills, contracts, or logs listing the nature of services provided with sufficient detail for the insurer to determine whether they are compensable.[62] Indeed, the best way of proving that a caregiver actually "expected compensation for [her] services" at the time the services were rendered[63] is for the caregiver to document the incurred charges contemporaneously with providing them—whether in a formal bill or in another memorialized statement that logs with specificity the nature and amount of services rendered—and submit that documentation to the insurer within a reasonable amount of time after the services were rendered. While no statutory provision *requires* that this method be used to establish entitlement to allowable expenses—a caregiver's testimony can allow a fact-finder to conclude that expenses have been incurred—a claimant's failure to request reimbursement for allowable expenses in a timely fashion runs the risk that the one-year-back rule will limit the claimant's entitlement to benefits, as occurred here when plaintiff commenced a lawsuit to recover allowable expenses that were alleged to have been incurred more than one year earlier.[64]

---

[62] In *Proudfoot*, we reiterated that payments for *future* services and products are not due until the expenses are actually incurred. For instance, we explained that while "[a] trial court may enter 'a declaratory judgment determining that an expense is both necessary and allowable and the amount that will be allowed[,] . . . [s]uch a declaration does not oblige a no-fault insurer to pay for an expense until it is actually incurred.'" *Proudfoot*, 469 Mich at 484, quoting *Manley*, 425 Mich at 157.

[63] *Burris*, 480 Mich at 1081.

[64] As noted previously, it would seem to be inherent in the notion of expectation of compensation that there is some requirement for the caregiver to give notice to the insurer that payment is being sought for particular compensable services. However, MCL 500.3107(1)(a) does not require a claim for allowable expenses to occur within any

25

Moreover, once a claimant seeks payment from the insurer for providing ongoing services, the insurer can request regular statements logging the nature and amount of those services to ensure that the claimed services are compensable.

The problem of a caregiver's failure to provide contemporaneous documentary evidence of allowable expenses is aptly illustrated in this case, in which Mrs. Douglas submitted documents constructed in one day as proof of services rendered over the course of approximately three years. The lack of contemporaneous documentation implicates her credibility regarding whether the services were actually rendered in the manner documented.[65] Moreover, this failure to provide contemporaneous documentation may also be relevant to the fact-finder's determination whether Mrs. Douglas actually expected payment for providing those services. In this case, the circuit court failed to make a finding regarding whether the charges were actually incurred, including whether Mrs. Douglas expected compensation or reimbursement at the time she provided the services. Nevertheless, the circuit court awarded plaintiff attendant care benefits for 67 hours a week for the period between May 31, 2004, and November 1, 2007, and 40 hours a week for the period between November 1, 2007, and November 18, 2009. The Court of

---

particular time. Nevertheless, the one-year-back rule may preclude recovery for a claimant who sits on his or her entitlement to benefits without doing *anything* to attempt recovery (including commencing a lawsuit). Thus, MCL 500.3145(1) states that a claimant "may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

[65] Contrary to the dissent's suggestion, this observation does not in any way invade the province of the fact-finder, who remains in the best position to weigh the credibility of all the evidence that a claimant presents to support a claim of entitlement to benefits.

Appeals remanded this case to the circuit court and allowed the circuit court to "take additional testimony, if necessary, and amend its findings or render new findings, and amend the judgment accordingly."[66] The panel identified three problems with the circuit court's award of attendant care benefits: the circuit court "clearly erred in awarding attendant care benefits to plaintiff without requiring sufficient documentation to support the daily or weekly hours underlying the award";[67] it erred by failing to consider "whether [Mrs. Douglas] reasonably expected compensation at the time of performance";[68] and it erred by failing to account for payments made to Dr. Rosenbaum's agency, TheraSupport, which employed Mrs. Douglas as plaintiff's attendant care provider.[69]

We underscore the importance of the proofs necessary to establish entitlement to benefits. The circuit court issued a judgment in favor of plaintiff without finding that the expenses were *actually incurred* given that its determination of the number of hours to award plaintiff had no discernible basis in the evidence presented at trial and did not examine whether Mrs. Douglas had the expectation of payment for her services. While it awarded plaintiff benefits for 40 hours a week of attendant care services for the period beginning November 1, 2007, in accord with Dr. Rosenbaum's prescription, there is no

[66] *Douglas*, unpub op at 7.

[67] *Id.*

[68] *Id.*

[69] *Id.* Plaintiff did not cross-appeal the Court of Appeals' determination that the circuit court clearly erred by awarding PIP benefits for allowable expenses without sufficient proof to support the underlying award.

basis for its findings that Mrs. Douglas *actually* provided 40 hours of care each week during that period. Indeed, because she was unavailable to provide services during her working hours, there is no basis for compensating her for any hours that she spent working outside the home.[70] Similarly, the award for the period before November 1, 2007, was made with no discernible basis in the record. Therefore, the Court of Appeals properly recognized that that award could not be sustained and appropriately remanded this case for findings of fact based on the evidence.[71]

Although the Court of Appeals established the scope of the determination of remand to the period after November 7, 2006, we direct the circuit court to make findings of fact as they pertain to the entire period of the lawsuit. The Court of Appeals did not

---

[70] The court explained, for instance, that "Katherine is the person to [provide care], but she cannot because she is employed full-time outside of the home and because [d]efendant will not pay the appropriate care rate for any hours of her care for [p]laintiff."

[71] Defendant claims that the Court of Appeals' decision to remand was improper because plaintiff already had an opportunity to present proofs regarding the attendant care services that Mrs. Douglas provided. Instead, defendant claims that since the Court of Appeals' ruling that the circuit court did not "requir[e] sufficient documentation to support the daily or weekly hours underlying the award" is uncontested, a verdict of no cause of action should be entered. *Douglas*, unpub op at 7. We disagree. The Court of Appeals acknowledged that "the trial evidence in this case did not reflect that Katherine maintained records of her claimed attendant care" and that, "[a]t most, there was evidence that Katherine completed 'affidavit of attendant care services' forms on June 25, 2007, for certain past months in an effort to reconstruct her time." *Id.* at 6-7. The holding of the Court of Appeals emphasized the fact that the circuit court's findings were legally insufficient, and the Court of Appeals' decision, while highly critical of some of the proofs provided, did not indicate that the circuit court could not sustain *any* award for attendant care services. Accordingly, we affirm the Court of Appeals' decision to remand for findings of fact regarding whether, and to what extent, allowable expenses were actually incurred in this case, and we do not disturb the Court of Appeals' ruling that the circuit court may take additional testimony on remand. See MCR 7.216(A)(5).

28

explain how it decided that only the period after November 7, 2006, should be considered on remand, and more important, there is nothing in the Court of Appeals' opinion or in the circuit court record that indicates that the circuit court's award for the period between May 31, 2004, and November 7, 2006, falls outside the ruling of the Court of Appeals that the circuit court "award[ed] attendant care benefits to plaintiff without requiring sufficient documentation to support the daily or weekly hours underlying the award."[72] Accordingly, we vacate the entire award of attendant care benefits and clarify that on remand the circuit court must examine the entire period to determine whether plaintiff submitted sufficient proofs that allowable expenses were incurred but not reimbursed.[73]

### 4. REASONABLE CHARGE FOR EXPENSES

Once a fact-finder has concluded that a plaintiff incurred allowable expenses in receiving care from a family member, the fact-finder must determine whether the charge is "reasonable."[74] In this case, the circuit court awarded attendant care benefits to plaintiff at a $40 hourly rate. Although the circuit court did not explicitly state the basis

---

[72] *Douglas*, unpub op at 7. The only discernable significance of that date in the record is that November 7, 2006, represents the date plaintiff began treatment with Dr. Rosenbaum. While we considered the significance of this date in determining whether services were "reasonably necessary" in the absence of a specific prescription for attendant care, this date has no independent significance in determining whether services were actually incurred.

[73] We also note the observation of the Court of Appeals that the circuit court failed to consider the extent to which defendant had already paid benefits for the attendant care services that Mrs. Douglas performed while serving as Dr. Rosenbaum's employee. Any award issued on remand must not include services that have already been reimbursed.

[74] MCL 500.3107(1)(a).

29

of its hourly rate, the Court of Appeals identified two pieces of evidence adduced at trial as justification for the circuit court's ruling: Dr. Rosenbaum's testimony that his company charges $40 an hour for attendant care and the testimony of defendant's adjuster regarding the rates that commercial agencies charge for attendant care services. We conclude that this testimony regarding the rates that commercial agencies charge is based on factors too attenuated from those underlying the rate charged for an individual's provision of attendant care services to be adopted as an individual's reasonable charge for attendant care services. This is a particularly erroneous circuit court finding given that Mrs. Douglas was actually paid $10 an hour by Dr. Rosenbaum's company for providing attendant care services to her husband. Why the circuit court believed that the commercial rate Dr. Rosenbaum charged was more relevant than what he paid Mrs. Douglas is unstated and unjustified on this record. Accordingly, the circuit court's $40 hourly rate is clearly erroneous.

Although this Court has not ruled on the issue, the Court of Appeals in *Bonkowski v Allstate Insurance Co* stated that a commercial agency's rate for attendant care services is irrelevant to the fact-finder's determination of what constitutes a reasonable rate for a family member's provision of those services. Then Judge ZAHRA, writing for the court, noted that "[i]n determining reasonable compensation for an unlicensed person who provides health care services, a fact-finder may consider the compensation paid to licensed health care professionals who provide similar services."[75] The opinion went on

---

[75] *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 164; 761 NW2d 784 (2008), citing *Van Marter*, 114 Mich App at 180-181.

to state that the fact-finder's "focus should be on the compensation provided to the person providing the services, not the charge associated by an agency that hires health care professionals to provide such services."[76]

The compensation actually paid to caregivers who provide similar services is necessarily relevant to the fact-finder's determination of a reasonable charge for a family member's provision of these services because it helps the fact-finder to determine what the caregivers could receive on the open market. While a commercial agency's fee incorporates this relevant piece of data—the compensation it pays to its caregivers—it also incorporates additional costs into its charge that family members who provide services do not incur, particularly the overhead costs inherent in the agency's provision of services. Thus, the total agency rate is too attenuated from the particular component of the agency rate that the fact-finder must determine in the instant case—"the compensation provided to the person providing the services . . . ."[77]

While we do not adopt the reasoning in *Bonkowski* in its entirety, we agree with *Bonkowski* that the fact-finder's focus must be on an *individual's* compensation. Accordingly, we hold that a fact-finder may base the hourly rate for a family member's provision of attendant care services on what health care agencies compensate their employees, but what health care agencies charge their patients is too attenuated from the appropriate hourly rate for a family member's services to be controlling.[78] Rather, the

---

[76] *Bonkowski*, 281 Mich App at 165.

[77] *Id.*

[78] Contrary to the dissent's suggestion, we believe that in appropriate circumstances the fact-finder should consider benefits that a full-time attendant care services employee

31

fact-finder must determine what is a reasonable charge for an *individual's* provision of services, not an agency's. While an agency rate might bear some relation to an individual's rate, it cannot be uncritically adopted as an individual's rate in the absence of specific circumstances that warrant such a rate—for instance, when the individual caregiver has overhead and administrative costs similar to those of a commercial agency.[79]

This case does not reflect such circumstances. Rather, there is undisputed testimony that Mrs. Douglas actually received $10 an hour in providing attendant care services to plaintiff during the time she served as Dr. Rosenbaum's employee. Because this figure is the rate she *actually* received for providing attendant care services, it is highly probative of what constitutes a reasonable charge for her services. Therefore, we agree with defendant that the circuit court clearly erred by ruling that plaintiff is entitled to a $40 hourly rate for Mrs. Douglas's attendant care services. The only evidentiary basis for that figure is the rate that commercial agencies charge for attendant care services, and that rate is far too attenuated from an individual caregiver's actual rate of

---

would receive as part of her total compensation package. Indeed, *Bonkowski*'s use of the term "compensation," rather than "wage," further supports this conclusion. *Bonkowski*, 281 Mich App at 165.

[79] While this case is not about the *admissibility* of the agency rates, which may in fact be helpful to the fact-finder as a point of comparison in determining a reasonable charge for an individual's provision of attendant care services, in this instance, we conclude that the fact-finder clearly erred by adopting that rate as the appropriate hourly rate for Mrs. Douglas's provision of attendant care services.

compensation to serve as the sole basis for the award of benefits in these circumstances.[80]

Therefore, if the circuit court concludes on remand that plaintiff has proved his entitlement to benefits for Mrs. Douglas's services, the circuit court, as fact-finder, must establish a new hourly rate based on an individual caregiver's hourly rate.

## IV.  CONCLUSION

Today, we reaffirm that MCL 500.3107(1)(a) imposes four requirements that an insured must prove before recovering PIP benefits for allowable expenses: (1) the expense must be for an injured person's care, recovery, or rehabilitation, (2) the expense must be reasonably necessary, (3) the expense must be incurred, and (4) the charge must be reasonable.[81]  Allowable expenses are distinguished from replacement services in that allowable expenses are *for* the insured's care as it "relate[s] to the insured's injuries."[82]

Defendant is not entitled to relief on its claim that Mrs. Douglas provided only replacement services, not allowable expenses, because the circuit court did not clearly err by ruling that Mrs. Douglas is plaintiff's caretaker.  Defendant is also not entitled to relief on its claim that plaintiff's attendant care was not reasonably necessary in the absence of a specific prescription for attendant care services because the testimony of Dr.

---

[80] The dissent's claim that "the trial court heard testimony from which it could conclude that Mrs. Douglas would need to quit her job outside the home in order to provide plaintiff with the attendant care his doctor prescribed" is simply irrelevant to determining the reasonable charge for attendant care services that were provided *while* Mrs. Douglas was employed outside the home.  *Post* at 15-16.

[81] See *Griffith*, 472 Mich at 532 n 8.

[82] *Id.* at 534.

Rosenbaum and defendant's claims adjuster provided a factual basis for the reasonable necessity of those services at all times relevant in this case.

We affirm the Court of Appeals' decision to remand this case for further proceedings, but we hold that the consideration on remand must encompass the entire period for which charges are claimed. We also emphasize the necessity that the circuit court, as the fact-finder, must base its ruling on proofs that show the extent to which Mrs. Douglas *actually provided* compensable attendant care services. Therefore, on remand, the circuit court must apply the standard of proof outlined in this opinion to determine whether plaintiff has proved that "charges" were "incurred" for his care. In particular, the circuit court must determine the extent to which plaintiff has proved the number of hours that Mrs. Douglas actually provided attendant care services and whether she actually expected compensation for those services. Finally, we reverse the Court of Appeals' decision regarding the circuit court's assessment of an hourly rate of $40 and conclude that that hourly rate is clearly erroneous because it is unrelated to an individual caregiver's hourly rate. While we do not establish an hourly rate in this case, the circuit court must establish a rate that is consistent with an individual caregiver's rate for services, rather than a commercial agency's rate.

Affirmed in part, reversed in part, award of attendant care benefits vacated and case remanded for further proceedings consistent with this opinion.

> Robert P. Young, Jr.
> Stephen J. Markman
> Mary Beth Kelly
> Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

JAMES DOUGLAS,

      Plaintiff-Appellee,

v                          No. 143503

ALLSTATE INSURANCE COMPANY,

      Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

I dissent from the majority's erroneous interpretation of the phrase "charges incurred" in MCL 500.3107(1)(a) and the resulting creation of evidentiary requirements that lack any basis in the statutory language. Likewise, I dissent from the majority's misguided limitation on the scope of evidence that may be considered when determining whether a charge is "reasonable" under MCL 500.3107(1)(a).[1]

Although the rules of statutory interpretation are well established, a brief review is warranted, given the majority's failure to adhere to these principles. This Court's primary goal is to "discern and give effect to the intent of the Legislature." *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). "The words of a statute

---

[1] Additionally, I continue to believe that the interpretation of MCL 500.3105 and MCL 500.3107 from the majority opinion in *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521; 697 NW2d 895 (2005), which the majority applies in this case, is incorrect for the reasons provided in Justice MARILYN KELLY's *Griffith* dissent. See *id*. at 542-554 (MARILYN KELLY, J., dissenting).

provide the most reliable evidence of its intent . . . ." *Id*. (quotation marks and citation omitted). When the language of a statute is unambiguous, "the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Id*. Accordingly, "[n]o further judicial construction is required or permitted." *Id*.

## I. "CHARGES INCURRED"

Under MCL 500.3107(1)(a), personal protection insurance (PIP) benefits include "allowable expenses." The statute goes on to explain that an "allowable expense" consists of, among other things, "charges incurred" for certain qualifying products or services. From the words "charges incurred," the majority mysteriously divines new evidentiary requirements that an insured must satisfy in order to obtain PIP benefits. Specifically, the majority determines that, in order to show that charges were incurred, an insured must establish (1) that the caregiver expected compensation for the services rendered, see *ante* at 23, and (2) that the caregiver's expectation of payment arose "at the time [the caregiver] provided the services," see *ante* at 26.[2] Neither of the majority's newly created requirements are supported by the statutory language at issue.

## A. CAREGIVER'S EXPECTATION OF COMPENSATION

I disagree with the majority's conclusion that MCL 500.3107(1)(a) requires a showing that the caregiver expected compensation. Rather, I continue to believe that the caregiver's expectation of payment is irrelevant because the obligation to pay "charges

---

[2] Included within the majority's conclusion that a caregiver must expect payment is an additional preference that documentation of the charges be provided in a "memorialized statement" because the majority considers such documentation to be the "best way of proving" entitlement to PIP benefits. *Ante* at 25. For the reasons discussed in part I(A), I disagree.

2

incurred" under MCL 500.3107(1)(a) lies with the *insurer* rather than the insured. *Burris v Allstate Ins Co*, 480 Mich 1081, 1088-1089 (2008) (WEAVER, J., dissenting). I also disagree with the majority's reliance on the definition of "incur" that was adopted in *Proudfoot v State Farm Mut Ins Co*, 469 Mich 476; 673 NW2d 739 (2003), because, as Justice WEAVER explained in her *Burris* dissent, *Proudfoot*'s definition of "incur" was limited to the facts of that case, in which the plaintiff sought advance payment for *future* expenses. *Burris*, 480 Mich at 1088 (WEAVER, J., dissenting). Accordingly, in *Proudfoot*, no one had incurred an expense because no service had been provided, and an insurer "is not obligated to pay any amount except upon submission of evidence that services were actually rendered . . . ." *Manley v Detroit Auto Inter-Ins Exch*, 425 Mich 140, 159; 388 NW2d 216 (1986). In this case, however, plaintiff seeks benefits for *past* expenses resulting from services that *have already been provided*. Accordingly, as long as the services were actually rendered and reasonably necessary and the amount of the charges was reasonable, defendant, as the insurer, has incurred the charges because of its statutory obligation to provide PIP benefits under MCL 500.3107(1). Unlike the majority's interpretation, Justice WEAVER's approach in *Burris* is consistent with the Legislature's intent that the no-fault act be construed liberally in favor of the insured. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 28; 528 NW2d 681 (1995).

In addition, I disagree with the majority's effort to further hamstring insureds' ability to recover PIP benefits to which they are entitled by imposing burdensome and statutorily unsupported preferences for specific documentary evidence. See *ante* at 25 (stating that the "best way of proving" that a caregiver expected payment is a "formal

3

bill" or "memorialized statement").[3] To begin with, the majority's determination that certain forms of evidence are always more persuasive than others is faulty because it is premised on the majority's conclusion that the caregiver must expect compensation. However, even accepting arguendo that compensation must be expected in order for a charge to be incurred for purposes of MCL 500.3107(1)(a), nothing in the statutory language supports the majority's gradation of the persuasiveness of various forms of evidence or the majority's resulting preference for a formal bill or memorialized statement. Particularly telling is the majority's failure to cite any authority in support of this preference for certain types of evidence. Indeed, the majority flatly admits that "no statutory provision *requires*" what the majority considers to be the "best" evidence. *Ante* at 25. Accordingly, although I agree that "itemized statements, bills, contracts, or logs listing the nature of services provided," *ante* at 25, would be more than enough to establish entitlement to PIP benefits, simple testimony or any other form of admissible evidence should also be sufficient.[4] See, generally, MRE 402 (providing that "[a]ll

_____

[3] As the majority opinion states, a formal bill or memorialized statement is not the *only* method sufficient to show that an insured is entitled to PIP benefits. See *ante* at 25 (acknowledging that "a caregiver's testimony can allow a fact-finder to conclude that expenses have been incurred"). Accordingly, despite the majority's unsupported conclusion that documentary evidence is "best," *any form of admissible evidence* could be equally sufficient to meet an insured's burden to prove that services were actually rendered.

[4] The majority apparently interprets my dissent as asserting that when a family member provides care, the insured need not provide any evidence that attendant care was actually provided. See *ante* at 24 n 60. This is not an accurate characterization of my dissent, however, because I agree that an insurer "is not obligated to pay any amount except upon submission of evidence that services were actually rendered . . . ." *Manley*, 425 Mich at 159. Rather, as I previously stated, I disagree with the majority's unsupported preference

4

relevant evidence is admissible . . .") and MRE 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Although the majority may be correct that certain types of evidence may be more persuasive under the specific circumstances of a particular case, by discussing the persuasiveness of various forms of evidence in absolutes, the majority invades the province of the fact-finder. See *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992) ("[A]ppellate courts are not juries, and . . . they must not interfere with the jury's role[.]"). Indeed, this error in the majority's approach is exposed in its discussion of the specific facts of this case, particularly the majority's statement that failure to provide certain documents "implicates [the caregiver's] credibility . . . ." *Ante* at 26. However, contrary to the majority's willingness to weigh in on witness credibility, this Court has frequently stated that appellate courts

> must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact. . . . Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. [*Wolfe*, 440 Mich at 514-515 (quotation marks and citation omitted).]

In summary, I disagree with the majority's conclusion that an insured must prove that a family caregiver expected compensation in order to prove that charges were

---

for *specific documentary evidence* because, in my view, *any form of admissible evidence* could be equally sufficient to meet an insured's burden to prove that services were actually rendered.

5

incurred for purposes of MCL 500.3107(1)(a). In my view, the insurer incurs the charge by way of its statutory obligation to provide PIP benefits under MCL 500.3107(1)(a) when the insured proves that the services were reasonably necessary and actually rendered and that the amount of the charge is reasonable. Furthermore, accepting arguendo the majority's declaration that an insured must prove that his or her caregiver expected compensation, I disagree with the majority's implication that certain forms of evidence will always be the "best way" to establish entitlement to PIP benefits. Not only does the majority admit that there is no statutory support for its conclusion, see *ante* at 25, the idea that an appellate court can determine the best evidence in a case has been consistently rejected as an improper invasion of the fact-finder's role as "the *sole* judge of the facts." *Wolfe*, 440 Mich at 514 (quotation marks and citation omitted; emphasis added).

## B. TIMING OF EXPECTATION AND REQUEST FOR PAYMENT

The majority creates another unsupported and previously nonexistent requirement when it states that a caregiver must expect compensation "at the time the services were rendered." *Ante* at 25; see, also, *ante* at 26 (stating that the "circuit court failed to make a finding regarding . . . whether Mrs. Douglas expected compensation or reimbursement *at the time she provided the services*") (emphasis added). Again, the majority fails to identify any support for this new timing requirement in either the caselaw or the statutory language of MCL 500.3107(1)(a). The reason for the majority's failure to do so is obvious: there simply is no support for the majority's judicially created requirement. This is particularly notable given that members of the majority have often railed against extratextual requirements. See, e.g., *People v Schaefer*, 473 Mich 418, 432; 703 NW2d

6

774 (2005).[5] Indeed, in *People v Wager*, 460 Mich 118, 123-124; 594 NW2d 487 (1999), the majority opinion expressly overruled a previous Court of Appeals opinion that had inserted a "reasonable time" requirement into the statute at issue in that case, stating "[N]o sound reason exists to engraft the 'reasonable time' element onto the clear language of the statute." Accordingly, I am at a loss about why the majority believes it is appropriate to engraft a time requirement onto MCL 500.3107(1)(a) despite the lack of any such requirement in the actual language of the statute.[6]

Although the lack of support in the statutory language is reason enough to reject the majority's analysis, the practical implications of the majority's burdensome new requirement is also worth consideration. Specifically, by requiring that a family

---

[5] See, also, *Johnson v Recca*, 492 Mich ___, ___; ___ NW2d ___; slip op, pp 25-26 (Docket No. 143088, issued July 30, 2012), stating that

> it must be assumed that the language and organization of the statute better embody the "obvious intent" of the Legislature than does some broad characterization surmised or divined by judges. . . . It is not for this Court to "enhance" or to "improve upon" the work of the lawmakers where we believe this can be done, for it will always be easier for 7 judges on this Court to reach agreement on the merits of a law than 110 state representatives or 38 state senators representing highly diverse and disparate constituencies. Therefore, this Court must . . . rest its analysis on the language and organization of the statute.

[6] The majority also expresses its belief that an insured should submit evidence "to the insurer *within a reasonable amount of time* after the services were rendered," *ante* at 25 (emphasis added). See, also, *ante* at 25 (discussing the "risk" of "fail[ing] to request reimbursement for allowable expenses *in a timely fashion . . . .*") (emphasis added). However, the majority admits that "MCL 500.3107(1)(a) does not require a claim for allowable expenses to occur within any particular time." *Ante* at 25 n 64. Thus, it is unclear to me why the majority chooses to create potential confusion by injecting the statutorily unsupported phrases "within a reasonable amount of time" and "in a timely fashion" into its application of MCL 500.3107(1)(a).

7

caregiver expect compensation, not only does the majority punish a family member who nobly acts to provide care to a loved one in a time of need, the majority also rewards *the insurer*, rather than the caregiver, for this act of kindness by allowing the insurer to avoid providing PIP benefits that it would otherwise be required to provide. This result is not only ethically troubling, but it also turns on its head the Legislature's intent that the no-fault act be construed liberally in favor of the *insured*. *Turner*, 448 Mich at 28.

Additionally, by requiring that the caregiver expect compensation at the time the services are provided, the majority fails to recognize the reality of situations in which attendant-care services are needed. Specifically, claims for PIP benefits arise out of automobile-related accidents, which were typically sudden, unexpected events. Accordingly, family members may unexpectedly be called upon to immediately provide care to a loved one. Given the nature of most families, I believe that in the vast majority of situations, the family member would be willing to provide the care, at least initially, without any contemporaneous expectation of compensation from anyone. Thus, I believe that it may be fairly common that the caregiver is initially not even aware of the possibility of compensation and the process that must be completed in order to recover that compensation. Indeed, not every citizen is an attorney well versed in the intricacies of the no-fault act. As a result, *at the time the services were provided*, the caregiver would have no expectation that *anyone* will provide compensation. Yet under the majority's analysis, if a family member did not expect compensation *at the time the services were provided*, despite the sudden and chaotic circumstances of the situation, he or she is not entitled to retroactively expect compensation for services provided in the past after discovering that compensation is a realistic possibility. This approach rewards

8

the insurer by allowing it to avoid providing PIP benefits that it would otherwise be obligated to provide under MCL 500.3107(1)(a) merely because the caregiver does not immediately demand compensation.[7]

## II. DETERMINING WHAT IS A "REASONABLE CHARGE"

Under MCL 500.3107(1)(a), PIP benefits are payable for "allowable expenses" as long as the charge is "reasonable."[8] In this case, the trial court, acting as the fact-finder in a bench trial, heard testimony from two sources regarding the rate typically charged by

---

[7] The majority dismisses as unfounded my concerns regarding the practicalities of the majority's new requirements, stating that "[c]ontrary to the dissent's suggestion, a family member's determination to provide care even in the absence of an insurer's payment is not inconsistent with expecting compensation from the insurer, but the expectation must nevertheless be present for a charge to be incurred within the meaning of MCL 500.3107(1)(a)." *Ante* at 23 n 56. However, this statement only addresses the *source* of the compensation, not the *timing* of when the caregiver developed the expectation of payment, regardless of the source. Under the circumstances that I discuss, the family caregiver does not expect compensation "at the time the services were rendered," *ante* at 25, which is an express requirement of the majority's erroneous interpretation of MCL 500.3107(1)(a). The majority claims that its requirement that compensation be expected at the time the services were provided "simply applies the dictionary definitions of the statutory phrase 'charges incurred.'" *Ante* at 23 n 56. However, even accepting the dictionary definitions that the majority selects, there is clearly no time component to those definitions. See *ante* at 22 (defining "incur" as "[t]o become liable or subject to, [especially] because of one's own actions," and "charge" as a "[p]ecuniary burden, cost" or "[a] price required or demanded for service rendered or goods supplied") (quotation marks and citations omitted). Indeed, applying these definitions, it is clear that a person could "become liable" for "a price demanded for services" *after* the services are rendered.

[8] The majority incorrectly states that "the fact-finder must determine what is a reasonable charge for an *individual's* provision of services . . . ." *Ante* at 31-32. Rather, the plain language of MCL 500.3107(1)(a) simply requires that the charge be "reasonable." Accordingly, although what an individual on the open market may be able to obtain as compensation is relevant, it is but one factor in a multifactor analysis to determine what is a "reasonable charge" under the circumstances of a particular case.

9

an agency to provide the care that Katherine Douglas provided. Additionally, the trial court heard testimony that while Dr. Thomas Rosenbaum's company employed Mrs. Douglas, she was paid at a rate of $10 an hour. Furthermore, the trial court heard testimony that Mrs. Douglas was unable to provide the hours of attendant care that plaintiff's doctor prescribed because she worked outside the home. After considering that testimony, the trial court awarded plaintiff PIP benefits at the rate of $40 an hour. In my view, agency rates are relevant to determining the proper rate of compensation for PIP benefits, and the trial court in this case properly considered the agency rates along with the other evidence submitted by the parties. Accordingly, I disagree with the majority that the trial court clearly erred in this case, and I would affirm the Court of Appeals on this issue.

Although the majority concludes that agency rates are both relevant and admissible in determining a "reasonable charge" under MCL 500.3107(1)(a), see *ante* at 32 n 79 (stating that "this case is not about the *admissibility* of the agency rates" because agency rates "may in fact be helpful to the fact-finder as a point of comparison in determining a reasonable charge for an individual's provision of attendant care services"); and *ante* at 32 (stating that "an agency rate might bear some relation to an individual's rate"), the majority nevertheless relies exclusively on the Court of Appeals' opinion in *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 165; 761 NW2d 784 (2008), which expressly stated that agency rates are "not relevant." I disagree with the majority's reliance on *Bonkowski* for several reasons.

To begin with, *Bonkowski* readily admitted that its entire discussion of the rate of compensation was dictum, stating that issue was not "squarely before" the Court. *Id.* at

10

164. Moreover, without justification, *Bonkowski* admittedly ignored caselaw that found agency rates relevant to determining the proper rate of compensation for a family member's provision of care. *Id.* (acknowledging that the Court of Appeals had "previously embraced the notion that 'comparison to rates charged by institutions provides a valid method for determining whether the amount of an expense was reasonable and for placing a value on comparable services performed [by family members]'"), quoting *Manley v Detroit Auto Inter-Ins Exch*, 127 Mich App 444, 455; 339 NW2d 205 (1983) (alteration in original). Further, *Bonkowski* cited no authority in support of its preferred approach to determining the proper rate of compensation for attendant care provided by unlicensed family members.

Most importantly, however, *Bonkowski* is poorly reasoned and, as a result, unpersuasive. Particularly unpersuasive is the notion that only the hourly rate paid to an attendant-care-services provider by an agency is relevant. Indeed, even the majority rejects this perspective. See *ante* at 32 n 79 (acknowledging that agency rates "may in fact be helpful to the fact-finder").[9] Accordingly, the majority is unwise to rely on *Bonkowski*'s analysis of this issue. Rather, I would adopt the reasoning from Judge

---

[9] The majority, however, also risks creating confusion when it states that the amount Mrs. Douglas was paid while employed by Dr. Rosenbaum "is highly probative of what constitutes a reasonable charge for her services" because "this figure is the rate she *actually* received for providing attendant care services . . . ." *Ante* at 32. This statement could be misinterpreted and lead lower courts to conclude that a professional caregiver's hourly rate is the *only* relevant evidence. Thus, to clarify, I agree with the majority that agency rates may be considered by the fact-finder in determining what constitutes a "reasonable charge" under MCL 500.3107(1)(a).

11

GLEICHER's majority opinion in *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651; ___ NW2d ___ (2011).

*Hardrick*, 294 Mich App at 678-679, first noted that the question whether expenses are reasonable is generally a question for the fact-finder, as this Court stated in *Nasser*, 435 Mich at 55. Second, *Hardrick* agreed with *Bonkowski* that "the rates charged by an agency to provide attendant-care services are not dispositive of the reasonable rate chargeable by a relative caregiver," but the opinion also concluded that "this does not detract from the relevance of such evidence." *Hardrick*, 294 Mich App at 666. Accordingly, I find persuasive *Hardrick*'s decision to review the issue through the lens of the admissibility of evidence. *Hardrick* explained that evidence is "relevant" and thus "material" when it helps prove a proposition that is a "material fact at issue." *Id.* at 667-668. Because the "material fact at issue" is the reasonable rate for attendant-care services for an insured, and insurers routinely pay agency rates for attendant-care services, *Hardrick* concluded that agency rates are relevant to determining the proper compensation for relative caregivers. *Hardrick* emphasized that the issue "is not whether an agency rate is reasonable per se under the circumstances, but whether evidence of an agency rate may assist a jury in determining a reasonable charge for family-provided attendant-care services." *Id*. at 669. Accordingly, because an agency rate commonly paid by insurers "'throws some light, however faint,' on the reasonableness of a charge for attendant-care services," it is admissible. *Id*., citing *Beaubien v Cicotte*, 12 Mich 459, 484 (1864).

Moreover, *Hardrick* explained that the fact-finder "may ultimately decide that an agency rate carries less weight than the rate charged by an independent contractor, or no

12

weight at all. But the fact that different charges for the same service exist in the marketplace hardly renders one charge irrelevant as a matter of law." *Hardrick*, 294 Mich App at 669. Indeed, the insurer would be free to introduce evidence showing the actual pay received by professional attendant-care-services providers and the overhead costs incurred by agencies that provide the care along with any other relevant evidence. In fact, in this case, defendant was permitted to counter plaintiff's evidence of the agency rate paid by Dr. Rosenbaum's company by showing that Mrs. Douglas was paid $10 an hour and with testimony from both defendant's medical expert and its claims adjuster. This is the critical error in the majority's reasoning: it fails to recognize that evidence of agency rates is only one of the various types of evidence that the fact-finder may consider in determining what constitutes a "reasonable charge," and the decision of which evidence is most relevant should be left to the fact-finder. Accordingly, I disagree with the majority's decision to opine regarding the weight that the fact-finder should give agency rates relative to other types of evidence when determining what constitutes a "reasonable charge." By doing so, the majority again forgets that "appellate courts are not juries, and . . . they must not interfere with the jury's role[.]" See *Wolfe*, 440 Mich at 514 (1992).

Indeed, by adopting *Bonkowski*'s emphasis on an individual caregiver's hourly rate, the majority's approach ignores other relevant considerations. For example, the family member might be forced to abandon a more lucrative career or move a great distance in order to be able to provide long hours of care to a loved one over an extended period. Additionally, the majority's approach marginalizes the fact that a family member who provides attendant-care services may be left without an array of benefits that a

13

professional attendant-care-services provider would ordinarily receive. For example, a professional attendant-care-services provider who is employed by an agency might receive health insurance benefits, vacation and sick leave, and retirement benefits, among other things. None of these benefits are represented in the professional attendant-care-services provider's hourly wage.[10] Thus, by singularly focusing on the rate paid to an attendant-care-services professional in order to determine what is a "reasonable charge" for family-provided care under MCL 500.3107(1)(a), the majority fails to recognize the complexity of the inquiry at hand and reduces the determination to a purely economic decision when that is simply not the reality of the situation.

Furthermore, by implying that certain evidence is deserving of greater consideration when determining a "reasonable charge," the majority risks making the possibility of family-provided attendant care unattainable for a large number of no-fault insureds because their family members simply cannot afford to suffer the financial ramifications of that decision. This result not only potentially places families in the unenviable position of being forced to institutionalize a family member in order to make a fair living, but it also runs counter to one of the goals of the no-fault act: to keep no-fault insurance affordable. See *Shavers v Attorney General*, 402 Mich 554, 627-628; 267

---

[10] I recognize that the majority briefly considers the issue of fringe benefits, see *ante* at 27 n 69, but the majority relegates the issue to a mere secondary consideration by repeatedly emphasizing that "Mrs. Douglas actually received $10 an hour in providing attendant care services to plaintiff," *ante* at 32. See, also, *ante* at 32 (stating that the $10 an hour rate is "highly probative" of what is a reasonable charge under MCL 500.3107(1)(a) because it was "the rate [Mrs. Douglas] *actually* received for providing attendant care services").

14

NW2d 72 (1978). Specifically, if a family member cannot afford to provide attendant care at the lower rate that the majority opinion essentially mandates, the insured may be forced into an institution, which will potentially increase the cost of attendant care and, therefore, the amount of PIP benefits that insurers must pay.

Finally, although the majority is correct that this Court has not previously considered this exact issue, the Court of Appeals' approach in *Hardrick* is more consistent with this Court's opinion in *Manley*, 425 Mich at 154, which considered the "reasonable charge" aspect of MCL 500.3107(1)(a) and held that evidence of a daily charge *by facilities* for "room and board" is admissible to determine a parent's costs for room and board of a disabled child *in the parent-caregiver's home*. See, also, *Manley*, 425 Mich at 169 (BOYLE, J., concurring in part and dissenting in part) (stating that "comparison to rates charged by institutions provides a valid method for determining whether the amount of an expense was reasonable and for placing a value on comparable services performed by [a family member]") (quotation marks and citation omitted). Thus, given this Court's guidance on the issue in *Manley*, and because I believe that *Hardrick*'s analysis is more thorough and well reasoned than *Bonkowski*'s, I would adopt *Hardrick*'s analysis

Applying *Hardrick*'s approach to this case, I would affirm the trial court's conclusion that $40 an hour is a "reasonable charge." The majority claims that the trial court's finding is "unjustified on this record"; however, the majority fails to consider a variety of factors that were before the fact-finder in this case. Specifically, the trial court heard testimony from which it could conclude that Mrs. Douglas would need to quit her job outside the home in order to provide plaintiff with the attendant care his doctor

prescribed. Moreover, the trial court heard testimony regarding both the agency rate and individual rate of pay for the type of care that Mrs. Douglas was providing. Notably, defendant could have submitted additional evidence in support of its claim for a lower hourly rate, but it chose not to do so. Thus, while the majority is correct that it is "undisputed" that "Mrs. Douglas actually received $10 an hour in providing attendant care services to plaintiff," *ante* at 32, it is also undisputed that agencies receive a higher rate of compensation for the same services, and it is also undisputed that Mrs. Douglas could not provide the attendant care that plaintiff needed while maintaining her employment outside the home. Thus, the rate paid to an individual caregiver fails to encompass all the ramifications of Mrs. Douglas's provision of attendant care to plaintiff. Accordingly, because "[t]he trier of facts is permitted to draw natural inferences from all the evidence and testimony," *Kostamo v Marquette Iron Mining Co*, 405 Mich 105, 120-121; 274 NW2d 411 (1979), I cannot agree with the majority's conclusion that the trial court in this case "uncritically adopted" the agency rates or that agency rates were "the sole basis for the award of benefits in these circumstances." *Ante* at 32-33. As a result, I am not "left with the definite and firm conviction that a mistake has been made," *Detroit v Ambassador Bridge Co*, 481 Mich 29, 35; 748 NW2d 221 (2008) (quotation marks and citation omitted), and, thus, in my view, the trial court did not clearly err on this issue.

### III. CONCLUSION

In summary, I dissent from the majority's effort to extend the erroneous interpretation of MCL 500.3107 from *Griffith*. Specifically, I disagree with the majority's judicially created requirements regarding what is necessary to show that a charge was incurred because those requirements are unsupported by the statutory

16

language at issue and, thus, contrary to the Legislature's intent with regard to MCL 500.3107(1)(a). Moreover, the majority's decision to rely, at least in part, on the reasoning from *Bonkowski*, 281 Mich App 154, is ill conceived because *Bonkowski* is poorly reasoned, particularly in comparison to the persuasive analysis in *Hardrick*, 294 Mich App 651. Furthermore, *Bonkowski* is contrary to this Court's opinion in *Manley*, 425 Mich 140. Accordingly, I dissent.

Michael F. Cavanagh
Marilyn Kelly
Diane M. Hathaway

17