# STATE OF MICHIGAN

# COURT OF APPEALS

ROLAND PRENDUSHI and JANIS
PRENDUSHI, Co-Guardians of RAJMONDA
PRENDUSHI,

      Plaintiffs-Appellees,

v

FARMERS INSURANCE EXCHANGE,

      Defendant-Appellant.

UNPUBLISHED
September 15, 2015

No.  321348
Oakland Circuit Court
LC No.  2013-134648-NF

---

ROLAND PRENDUSHI and JANIS
PRENDUSHI, Co-Guardians of RAJMONDA
PRENDUSHI,

      Plaintiffs-Appellees,

v

FARMERS INSURANCE EXCHANGE,

      Defendant-Appellant.

No.  321511
Oakland Circuit Court
LC No.  2013-134648-NF

---

Before: MURRAY, P.J., and METER and OWENS, JJ.

PER CURIAM.

In this consolidated, first party no-fault insurance case, we granted defendant Farmers Insurance Exchange ("Farmers") leave to appeal three orders.  First, in Docket No. 321348, Farmers appeals the trial court's order denying its motion in limine to exclude testimony concerning the reasonableness of certain attendant care expenses incurred by the injured claimant, Rajmonda Prendushi (Mrs. Prendushi).  Second, in that same case, Farmers challenges the trial court's order denying its motion for summary disposition of plaintiffs' claims seeking certain accommodation and attendant care expenses.  Finally, in the companion case, Docket No. 321511, Farmers appeals the trial court's order requiring production of Farmers' entire litigation file.

-1-

For the reasons set forth below, in Docket No. 321348, we affirm the trial court's order denying Farmers' motion in limine, but vacate the trial court's summary disposition ruling that plaintiffs' rent is an "allowable expense." In all other respects, we affirm the trial court's order denying summary disposition. In Docket No. 321511, we reverse the trial court's order requiring Farmers to produce its entire litigation file since that ruling is premature. We remand (1) for the parties to resubmit to the trial court the issue of plaintiffs' claim for rental costs and (2) for the trial court to determine the scope of the work-product doctrine's protection of Farmers' litigation file.

## I. BACKGROUND

The nearly decade-and-a-half of litigation between these parties spans back to 1999, when Mrs. Prendushi was involved in a serious auto accident. She sustained traumatic brain and spinal cord injuries resulting in incomplete quadriplegia, among other problems. The injuries are permanent and require 24-hour care. Upon leaving the nursing facility in 2001, Mrs. Prendushi moved into an apartment and began receiving attendant care from her husband and daughter—respectively, plaintiffs Roland (Mr. Prendushi) and Janis Prendushi. Mrs. Prendushi's sister, Linda Ziu, also assists with this care. The parties intended the apartment to be a temporary living arrangement until plaintiffs could secure more "suitable" housing; however, since Mrs. Prendushi moved to the apartment several disputes have arisen regarding not only her housing situation, but also her attendant care costs. In fact, the current case is the fourth lawsuit between these parties regarding personal protection insurance (PIP) benefits, the most recent having been resolved in April 2012 when the parties accepted a case evaluation award of $630,000 to be used for barrier-free housing, handicap-modified transportation, and attendant care costs.[1]

Around the time case evaluation concluded, Mrs. Prendushi was prescribed an additional six hours of daily attendant care for pain management. This brought her attendant care regimen to 30 hours a day. Although plaintiffs sought total reimbursement from Farmers for this expense, over the ensuing year, the parties disputed whether plaintiffs had provided Farmers with the proper documentation and records. Plaintiffs claimed Farmers had refused to pay the amount due despite receiving the prescription and a doctor's letter; Farmers claimed plaintiffs had neglected to provide the personal and tax information of the person providing the additional six hours of care. Finally, on June 20, 2013, Farmers agreed to pay all additional hours of attendant care retroactive to April 2012, but at the lower rate of $12 an hour rather than the $18 an hour Farmers was paying for the 24-hour care provided by Mrs. Prendushi's family. Farmers claimed the disparity in payment derived from the different skill levels needed to render the different types of care. Farmers remitted all payment to Mr. Prendushi, who in turn, was responsible for compensating the other caregivers and paying any taxes.

Concurrent with that controversy, plaintiffs continued searching for a "suitable" housing arrangement for Mrs. Prendushi. This was part of the ongoing search that had begun shortly after the accident since, according to plaintiffs, Farmers had previously rejected Mr. Prendushi's

---

[1] For the first three lawsuits, see Oakland Circuit Court Case Nos. 01-032543-CK, 07-083748-NF, and 11-119514-NF.

offer to modify the house his family had lived in before the accident and had refused to pay for the house he had subsequently purchased in Bloomfield Hills. Despite this, Farmers continued paying Mrs. Prendushi's rent after case evaluation through May 2013—a full six months beyond the deadline Farmers had originally imposed. Farmers ceased paying rent at that time ostensibly because plaintiffs' housing updates were inadequate. However, on June 20, 2013, plaintiffs informed Farmers that they had purchased a house in Sylvan Lake and that Mrs. Prendushi had received an eviction notice from her apartment for nonpayment of rent.[2] By July 5, 2013, Farmers had resumed Mrs. Prendushi's rental payments.

## II. PROCEEDINGS

In the meantime, on June 21, 2013, plaintiffs filed their complaint. Primarily seeking reimbursement for attendant care and housing expenses, plaintiffs alleged that Farmers had (1) failed to pay (or delayed in paying) for the additional six hours of daily care, (2) "underpaid" Mr. Prendushi for the round the clock care he provides, and (3) failed to reimburse plaintiffs for housing and rental expenses. Farmers initially filed a motion for summary disposition under MCR 2.116(C)(10), arguing that PIP benefits were not recoverable as a matter of law and that no benefits were otherwise overdue. However, this motion was withdrawn in light of ongoing discovery and the parties' settlement negotiations.

Over five months later the parties remained at an impasse, so Farmers refiled its dispositive motion. In addition to its prior arguments, Farmers noted that: rent was not a reasonable expense where plaintiffs' apartment was not modified; plaintiffs lacked proof of additional attendant care expenses and the need for Farmers to keep paying their rent; and Farmers had fairly compensated plaintiffs for providing attendant care.

Plaintiffs responded that Farmers had admitted their claimed expenses, that plaintiffs' caregivers provided the same services as a skilled nurse, and that the need for Mrs. Prendushi's care was undisputed. Plaintiffs also submitted the affidavit of their case manager, Pamela Feinberg-Rivken.[3] Feinberg-Rivken addressed the reasonableness of plaintiffs' attendant care costs, claiming that plaintiffs' caregivers provided services akin to those of a skilled nurse, whose hourly compensation would ordinarily range between $40 and $60. Feinberg-Rivken also opined that a rate of $12 an hour for the additional six hours of daily care was insufficient.

Farmers countered with two filings. First, Farmers filed a reply arguing that Feinberg-Rivken's affidavit failed to establish that a skilled or registered nurse was necessary, and that plaintiffs had otherwise failed to substantiate their expenses. Second, Farmers moved in limine to exclude evidence concerning wages paid to skilled nurses and to exclude Feinberg-Rivken's

---

[2] Notably, although the purchase agreement for that house was dated November 30, 2012, plaintiffs waited until June 20, 2013, to provide this information to Farmers. Apparently, foreclosure proceedings delayed closing until April 2013.

[3] Feinberg-Rivkin is the CEO of Feinberg Consulting, a firm assisting individuals struggling with catastrophic injuries.

testimony. Farmers primarily argued that Feinberg-Rivken's testimony as to the reasonableness of expenses would be irrelevant absent evidence that those expenses were actually incurred. Plaintiffs, of course, contested all of Farmers arguments.

The trial court dealt with both motions in turn, issuing two orders on April 1, 2014. First, the court denied Farmers' motion in limine, ruling that the motion amounted to a "disguised, untimely motion for summary disposition." Additionally, the court observed that plaintiffs had submitted evidence of their expenses and that Farmers' request to exclude evidence of a skilled nurse's wages pertained to weight rather than admissibility.

Second, the court denied Farmers' summary disposition motion in 27-page opinion and order. Beginning with rental payments, the court determined a genuine issue of material fact existed as to whether the apartment was an allowable expense. The court based this ruling on the attorneys' conflicting reports as to whether Mrs. Prendushi's apartment was in fact modified for her care (Farmers' counsel asserted there were no modifications to the apartment based on a letter from plaintiffs' counsel; plaintiffs' counsel claimed the apartment was modified by installing grab bars and removing doors). Equally unclear was the scope of Farmers potential exposure since the evidence did not establish whether the potential modifications were "combined" or "integrated" with the apartment.[4] Still, the court noted that plaintiffs' "mitigation [of expenses by moving into the apartment] appears to be a consideration" weighing in plaintiffs' favor.

Similarly, the court rejected Farmers' alternative assertion that plaintiffs failed to provide reasonable proof of ongoing rental payments because (1) Farmers sought no reimbursement for rent already paid, (2) Farmers' correspondence effectively conceded that plaintiffs' update letters constituted reasonable proof, (3) Farmers did not define "reasonable proof," and (4) Farmers was continuing to pay rent. The court added that Mr. Prendushi had detailed his efforts to purchase a home in his deposition and that Farmers' claims adjuster, Michael Schwab, could not explain why his affidavit accused Mr. Prendushi of being uncooperative. The court elaborated, however, that its ruling did not excuse plaintiffs from providing "reasonable proof of loss (ongoing need for rent)."

As for attendant care expenses, the court held that the Feinberg-Rivkin affidavit was sufficient to create a genuine issue of material fact as to whether Farmers underpaid Mrs. Prendushi's attendant care costs. In making this determination, the court refused to substantively address the affidavit's admissibility since Farmers first raised that issue in its reply brief. Moreover, the court explained, the depositions of both Mr. Prendushi and Schwab proved that plaintiffs had actually incurred attendant care costs, contrary to Farmers' argument. The fact that plaintiffs' requests for repayment were not contemporary with the provision of services was also of no moment to the trial court.

---

[4] See *Admire v Auto-Owners Ins Co*, 494 Mich 10, 28; 831 NW2d 849 (2013) (distinguishing between the recovery allowed for "combined" and "integrated" accommodations).

Accordingly, the court denied Farmers' motion for summary disposition and its accompanying request for attorney fees under MCL 500.3148(2). Farmers then sought leave to appeal both this order as well as the order denying its motion in limine.

While that application was pending, the trial court issued another order—this time requiring Farmers to turn over its entire litigation file. Precipitating that ruling was plaintiffs' second motion to strike witnesses/evidence in which plaintiffs argued, among other things, that the work-product doctrine was insufficient to shield Farmers' litigation file from discovery.[5] Agreeing with plaintiffs, the trial court ruled that Farmers' failure to produce a sufficiently detailed privilege log precluded application of the privilege. As the trial court explained:

> The Defendant's assertion of privilege for the litigation file in total states a bald conclusion: "Entire file not produced pursuant to MCR 2.302(B)(3)(a) for referencing mental impressions, conclusion, opinions, or theories of a party in anticipation or for trial and communication subject to attorney-client privilege." This is woefully inadequate—especially because the Defendant nowhere identifies, e.g., how many documents are in this file, or who authored the documents, thereby depriving one from determining if the asserted justification is appropriate. Interestingly, the privilege log assertion with regard to the MCCA, which involves only a single document, is more than twice as long as the entire log for the litigation file. The litigation file privilege has been waived. No privilege log is asserted for the SIU file—if it exists, that privilege has been waived. The litigation file and SIU files (if the SIU file exists) shall be produced by April 29, 2014.

Farmers immediately sought leave to appeal that order and requested a stay. On April 30, 2014, this Court granted both requests as well as Farmers' prior leave application. The cases were consolidated that same day.[6]

### III. DOCKET NO. 321348

Farmers attacks the trial court's denials of its motion for summary disposition and motion in limine on mostly the same grounds as those asserted below. Our review of the record shows that both parties failed to properly support their positions at summary disposition on the issue of whether plaintiffs' rent is an "allowable expense." Accordingly, we vacate that portion of the trial court's summary disposition ruling. Because defendant's other challenges lack merit, we affirm the rest of that ruling as well as the court's order denying defendant's motion in limine.

---

[5] Plaintiffs also requested Farmers' Michigan Catastrophic Claims Association (MCCA) and Special Investigation (SIU) files. Farmers asserted the MCCA file was part of its general insurance claims file, known as the PIP file, and asserted that the former was privileged. As for the SIU file, Farmers claimed it did not exist.

[6] *Prendushi v Farmer Ins Exch*, unpublished order of the Court of Appeals, entered April 30, 2014 (Docket Nos. 321348 & 321511).

A.  SUMMARY DISPOSITION

The trial court granted summary disposition under MCR 2.116(C)(10).  We review a trial court's ruling on a motion for summary disposition de novo.  *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 693; 818 NW2d 410 (2012).  Judgment for the moving party hinges on whether there exists a genuine issue of material fact.  *Curry v Meijer, Inc*, 286 Mich App 586, 590; 780 NW2d 603 (2009).  "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ."  *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).  Initially, the moving party bears the burden to support its claim through affidavits, depositions, admissions, or other documentary evidence.  *McCoig Materials, LLC*, 295 Mich App at 693.  When the moving party properly supports its motion, the burden shifts to the nonmoving party who may not rest upon the mere allegations or denials of its pleading; instead, to survive the motion, the nonmoving party must, by affidavits or other evidentiary materials, set out specific facts showing that there is a genuine issue for trial.  MCR 2.116(G)(4); *Skinner v Square D Co*, 445 Mich 153, 160-161; 516 NW2d 475 (1994).  If after this there remains no genuine issue of material fact, the moving party is entitled to judgment a matter of law.  *Curry*, 286 Mich App at 591.

1.  ALLOWABLE EXPENSES UNDER THE NO-FAULT ACT

The no-fault automobile insurance act, MCL 500.3101 *et seq.*, entitles those injured in automobile accidents to a variety of PIP benefits from their insurance carriers.  *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012).  Among the categories of PIP benefits compensable under this scheme are those for "allowable expenses," MCL 500.3107, which plaintiffs seek in this case.  "Allowable expenses" consist of "all reasonable charges incurred or reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation."  MCL 500.3107(1)(a).  Accordingly, for a PIP claimant to obtain benefits for an "allowable expense," the following must be true: "(1) the expense must be for an injured person's care, recovery, or rehabilitation, (2) the expense must be reasonably necessary, (3) the expense must be incurred, and (4) the charge must be reasonable."  *Douglas v Allstate Ins Co*, 492 Mich 241, 259; 821 NW2d 472 (2012).

a.  IS PLAINTIFF'S RENT AN ALLOWABLE EXPENSE?

In determining what constitutes an "allowable expense," our Supreme Court has emphasized MCL 500.3107(1)(a)'s plain language, noting that unless a product, service, or accommodation is actually *for* an injured person's care, recovery or rehabilitation, it is not recoverable.  *Admire v Auto-Owners Ins Co*, 494 Mich 10, 25-26; 831 NW2d 849 (2013).  Thus, costs for ordinary, everyday products, expenses, or accommodations that an injured claimant would otherwise bear absent the injury do not qualify.  *Id*. at 26.  Instead, the product, expense, or accommodation must be "new in its essential character" to be compensable.  *Id*. at 27.

The joining of a special accommodation or modification to an ordinary item does not deprive the accommodation or modification of its essential character, however.  Rather the scope of recovery under those circumstances depends upon whether the special accommodation or modification is "combined" or "integrated" with the ordinary item.  *Id*. at 28.  A "combined"

-6-

accommodation or modification is one that, although joined to an ordinary product, may be separated into components related specifically to the injured person's care, recovery, or rehabilitation. *Id*. at 28-29. Of course only the separate components are compensable for "combined" modifications. *Id*. In contrast, an "integrated" modification is one blended with an ordinary product such that the resulting product or accommodation cannot be separated easily into unit costs. *Id*. at 29. An "integrated" product is compensable in full. *Id*. at 29-30.

In the trial court Farmers asserted (as it does now) that plaintiffs' rent is not an "allowable expense" because the apartment provides no special accommodations for Mrs. Prendushi's care, recovery, or rehabilitation. Thus, Farmers argued, the apartment is merely an ordinary cost of life. In support, Farmers *only* cited a letter from plaintiffs' counsel dated November 29, 2012, explaining that Mrs. Prendushi's apartment does not accommodate her injures.[7] As the letter states in pertinent part:

> [P]lease be advised that my clients, Roland Prendushi and Rajmonda Prendushi, have been living in extremely unacceptable and intolerable living conditions. More specifically, the apartment does not have proper bathroom accessibility for Mrs. Prendushi, who showers at the local YMCA and does NOT accommodate her physical, cognitive and emotional disabilities. [Emphasis in original.]

Citation to a letter containing the statement of another-when offered for the truth of the matter asserted, as it was here-is not proper documentation in support of a motion for summary disposition. MCR 2.116(G)(6); *CSC Assoc Ltd Partnership v Gen Retirement Sys*, 192 Mich App 360, 364; 480 NW2d 275 (1992). Defendant therefore failed to shoulder its burden in properly supporting its motion, *Oliver v Smith*, 269 Mich App 560, 566-567; 715 NW2d 314 (2006), and it should have been denied on this issue on that ground alone.

Nevertheless, the trial court made a ruling based upon plaintiff's counsel's letter and the references made by that same attorney contained in the response to the motion for summary disposition. In that response counsel asserted that there were some modifications made to the apartment, in particular handrails and removal of some doors. Based on that assertion, the court concluded that modifications were made. But none of this is *evidence*, and the court can only grant or deny summary disposition under MCR 2.116(C)(10) based on properly presented evidence. MCR 2.116(G)(3)(b).

In fact, the *only* proper documentary evidence presented below (attached to plaintiff's response) was a letter from Mr. Prendushi that merely foreshadowed the message from plaintiffs' attorney quoted previously. As Mr. Prendushi's letter explained: "[W]e cannot live in this apartment anymore [because] [t]here is no accessibility for my wife, no bathroom for her, no space to move her around and our master bedroom has been used as a bathroom for almost 13

---

[7] Although Farmers contends that, in addition to this letter, it also provided a description of plaintiffs' apartment, no such description accompanied Farmers' motion below.

years, the whole apartment smells so bad." At first blush this letter seems to reveal that plaintiffs' apartment does not accommodate *any* of Mrs. Prendushi's injuries.

However, on appeal both parties rely on evidence they did not cite below. Plaintiffs cite Mr. Prendushi's deposition testimony indicating that a ramp and bars were installed for his wife.[8] By the same token, while Farmers quotes this same deposition transcript for Mr. Prendushi's assertion that the apartment was *not* accessible for his wife, Farmers did not rely upon that testimony in support of its argument below, either. This is certainly not the forum for the parties to rely on evidence they neglected to cite in the first instance. See *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 380; 775 NW2d 618 (2009) ("When reviewing a motion for summary disposition, this Court's review is limited to review of the evidence properly presented to the trial court"), citing, among others, *Guarino v Brookfield Twp Trustees*, 980 F2d 399, 404 (CA 6, 1992) ("This Court will not entertain on appeal factual recitations not presented to the district court any more readily than it will tolerate attempts to enlarge the record itself."). We accordingly vacate the trial court's ruling regarding whether the rent is an ordinary expense, and remand for further consideration of this issue through the submission of evidence (be it by motion or otherwise) to the trial court.[9]

Because this issue will be reviewed again on remand, we briefly comment upon the trial court's alternative mitigation analysis. Specifically, the trial court held that where Mrs. Prendushi moved from the nursing home only after consultation with Farmers, the question of whether this move reasonably mitigated plaintiffs' damages was one for the jury. In reaching this determination, the trial court relied on *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 651-652; 513 NW2d 799 (1994), in which the Supreme Court determined that the common law obligation to mitigate damages applied to a claim for work-loss benefits under MCL 500.3107(1)(b) (permitting recovery for lost income resulting from the work an injured person would have performed for three years after the accident but for the injury). *Id*. at 651. But whether an injured claimant has an obligation to accept a lesser paying job in order to mitigate work-loss damages is distinct from the central question here. Indeed, the issue at hand is not whether Mrs. Prendushi was required to live in an apartment rather than a nursing home in order to mitigate damages, but instead whether her apartment is reasonably necessary

---

[8] Plaintiffs admit that they did not cite, let alone mention, that testimony in their response below. Moreover, it was Farmers—*not plaintiffs*—who provided that deposition transcript to the trial court in its reply brief, i.e., *after* plaintiffs filed their response.

[9] Farmers additionally argues that ongoing rental expenses are not compensable. Discussion of that issue would be premature, however, given that on remand the court must first resolve the threshold matter of whether any compensable modifications were made to the apartment in the first place. Nevertheless, we note that neither party disputes that housing is an ordinary cost of life. Accordingly, if it is determined that compensable modifications were made to the apartment, the remaining issue is whether plaintiffs are entitled to compensation for a combined or integrated modification. In the event those modifications are integrated, the court would then have to determine whether ongoing rental costs are appropriate.

for her care, recovery, or rehabilitation under § 3107(1)(a). Only if it is are the expenses compensable.

To this point, *Griffith v State Farm Auto Ins Co*, 472 Mich 521; 697 NW2d 895 (2005), is instructive. There, the Supreme Court determined that an injured claimant's food was an allowable expense if consumed at an institution, but not at home since the claimant was required to eat "hospital food" for his care, recovery, or rehabilitation while in the institution. *Id*. at 537-538. By analogy, the Court extended this reasoning to housing costs, asking rhetorically, "While Griffith was institutionalized, defendant paid his housing costs. Should defendant therefore be obligated to pay Griffith's housing payment now that he has been released when Griffith's housing needs have not been affected by his injures?" *Id*. at 539.

Here, no one disputes that housing is an ordinary cost of life. Rather, the issue is whether Mrs. Prendushi's apartment has been modified for her care, recovery, or rehabilitation. Or, in *Griffith's* language, are Mrs. Prendushi's housing needs affected by her injuries? *Id*. Plaintiffs obviously argue that her housing needs are so affected, but absent any evidence that an otherwise ordinary apartment has been modified for those needs, Farmers cannot be liable for her rent. And while we are sensitive to plaintiffs' claim that they used an unsuitable apartment as a stopgap while they located suitable housing, Farmers' total liability for the rent still hinges on whether the apartment was equipped with handicap modifications, either in a combined or integrated fashion. *Admire*, 494 Mich 28-29. Again, only the latter is fully compensable. As we previously concluded, however, on *this* record there was insufficient evidence (with some of the evidence simply conflicting) as to whether the apartment was modified for Mrs. Prendushi's care, recovery, or rehabilitation, such that the rent—or the cost for accommodation, depending on its scale and scope—are an "allowable expense." The trial court must reconsider this issue on remand.[10]

b. ARE PLAINTIFFS' ATTENDANT CARE EXPENSES "ALLOWABLE EXPENSES?"

Regarding Mrs. Prendushi's attendant care costs, Farmers does not dispute that such expenses, even if provided by family members, may constitute allowable expenses under the no-fault act provided they are not for "ordinary and necessary services." See *In re Carroll (On Remand)*, 300 Mich App 152, 170; 832 NW2d 276 (2013), citing *Douglas*, 492 Mich at 262.

---

[10] Farmers asserts that the trial court's subsequent order excluding evidence of any "costs-savings" plaintiffs may have achieved by moving from the nursing home effectively undermines the trial court's mitigation analysis. Plaintiffs respond that the trial court's evidentiary ruling—relying at least in part on MRE 403 to exclude evidence whose undue prejudice substantially outweighed its probative value—was based on a different standard. What plaintiffs fail to realize, however, is that evidence must be substantively admissible in order to defeat a motion for summary disposition. *Barnard*, 285 Mich App at 373 (a trial court may only consider substantively admissible evidence when ruling on a motion for summary disposition). Regardless, because the trial court improperly denied Farmers' motion for summary disposition on this point for the reasons already stated, we need not consider this unpreserved argument further.

Instead, Farmers claims plaintiffs may not recover additional attendant care costs because: (1) Mrs. Prendushi did not actually incur costs for those services, (2) plaintiffs submitted no proof of the amount of loss, and (3) Mrs. Prendushi's costs are not reasonable. Taking each in turn, we conclude that each of these arguments lacks merit.

### i. DID PLAINTIFFS INCUR ATTENDANT CARE EXPENSES?

The law is clear that in order for attendant care costs to constitute "allowable expenses" under the no-fault act, they must, among other things, actually be incurred by the claimant. *Douglas*, 492 Mich at 262-263. An expense is actually incurred when the claimant "become[s] liable or subject to [someone] because of [his or her] own actions." *Id*. at 267 (citation omitted). The touchstone for determining whether an injured claimant actually incurred attendant care expenses as contemplated by MCL 500.3107(1)(a) hinges on whether the caregiver has an expectation of compensation. *Douglas*, 492 Mich at 267-268, citing *Burris v Allstate Ins Co*, 480 Mich 1081; 745 NW2d 101 (2008). This expectation may be established in a variety of ways, including documentary evidence (such as bills, statements or contracts) or even a caregiver's testimony. *Douglas*, 492 Mich at 269-270. However, "[w]ithout the expectation of compensation the evidence fail[s] to establish that the plaintiff 'incurred' attendant-care expenses." *Id*. at 268, quoting *Burris*, 480 Mich at 1081 (second alteration in original).

Concerning incurred expenses, Farmers focuses exclusively on whether plaintiffs' family-caregivers expected compensation for attendant care costs beyond what Farmers had already paid. In support, Farmers cites only the deposition testimony of Mrs. Prendushi's husband and daughter. As for the former, Farmers asserts that Mr. Prendushi expressed only dissatisfaction with the rate he was paid (Mr. Prendushi conceded he was unhappy with his remuneration, but could not explain what rate of compensation he considered reasonable). And as for the latter, Farmers points out that Mrs. Prendushi's daughter admitted that her mother owed her nothing for her services.

Setting aside the daughter's testimony (whose testimony does not create a genuine issue of material fact), this evidence viewed in the light most favorable to plaintiffs does not reveal that Mr. Prendushi lacked an expectation of compensation. To the contrary, it reveals that he expected greater compensation. Mr. Prendushi could not have made this point more succinctly than when he testified at that same deposition that the rate Farmers paid "was not good for me."[11] While Mr. Prendushi did not explain exactly how much he expected to receive, numerical certainty is not the standard under *Douglas*. Rather, the claimant need only provide "some basis for a fact-finder to conclude that the caregiver had some expectation of compensation from the insurer, even if the expectation of compensation was not the primary motivation for providing the care." *Douglas*, 492 Mich at 267 n 56. By the same token, the family member's determination to provide care, even in the absence of sufficient payment from the insurer, does not forfeit the caregiver's expectation of compensation. *Id*. Accordingly, there minimally exists

---

[11] Plaintiffs also cite evidence that Farmers' claim adjusters conceded the necessity of attendant care. However, neither citation goes to the expectation of compensation held by Mrs. Prendushi's family-caregivers.

a genuine issue of material fact as to whether Mrs. Prendushi incurred attendant care costs with respect to Mr. Prendushi's services.

### ii. DID PLAINTIFFS PROVE THE AMOUNT OF LOSS?

Farmers contends that even if Mrs. Prendushi incurred additional attendant care costs, they did not establish the amount of those costs as MCL 500.3142 requires. Section 3142 requires a claimant to submit "reasonable proof of the fact and of the amount of loss sustained" to trigger an insurer's obligation to pay. MCL 500.3142(2). This is necessary since a jury may not speculate as to the amount of losses a claimant has incurred. *Attard v Citizens Ins Co of America*, 237 Mich App 311, 322; 602 NW2d 633 (1999). However, in submitting reasonable proof, the claimant need not establish the exact amount of money the insurer owes since "[t]he statute requires only *reasonable* proof of the amount of loss, not exact proof." *Williams v AAA Mich*, 250 Mich App 249, 267; 646 NW2d 476 (2002) (emphasis in original).

In support of its argument, Farmers accuses plaintiffs of not just failing to prove the amount of their loss, but of actually refusing to submit any proof on this issue. Specifically, Farmers highlights Mr. Prendushi's reliance on the attorney-client privilege in refusing to delineate the total amount of compensation he seeks from Farmers. Mr. Prendushi's testimony is not the whole story, however, as plaintiffs also submitted the affidavit of their caseworker, Feinberg-Rivkin, in response to Farmers' motion. That affidavit—whose admissibility Farmers challenged in a separate motion—sets forth the caseworker's familiarity with Mrs. Prendushi's attendant care needs as well as the services provided by Mrs. Prendushi's family. Feinberg-Rivkin clearly opined that Mrs. Prendushi's caregivers provide services akin to those of a skilled nurse, whose hourly compensation would range between $40 and $60, and that anyone providing such services would be entitled to that level of compensation regardless of his or her classification as a skilled nurse.

This evidence clearly does not call upon jurors to guess, but instead provides an exact range from which they may determine whether plaintiffs seek a reasonable amount of additional attendant care costs. Plaintiffs have therefore satisfied their burden to respond with documentary evidence regarding the amount of their loss.[12] The trial court was correct on this point.

### iii. ARE THE ATTENDANT CARE COSTS REASONABLE?

As its last fallback, Farmers maintains that plaintiffs' additional attendant care costs are not recoverable because they are unreasonable. We begin our analysis by stating the obvious: insurers are only obligated to pay PIP benefits for reasonable charges. *Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 448; 814 NW2d 670 (2012). But what constitutes a

---

[12] Plaintiffs also assert that, in addition to the Feinberg-Rivkin affidavit, they presented evidence that Mr. Prendushi responded to all of Farmers' requests for information regarding attendant care services and that Farmers' claims adjusters failed to review the claims file adequately. However, neither aids our analysis here since neither pertains to the additional *amount* plaintiffs claim Farmers owes.

reasonable charge?  While the fact-finder ultimately makes this determination, *id*., our Supreme Court has provided guidance regarding the reimbursement of family-caregivers like the ones in this case.  Most relevant is the actual rate paid to caregivers who provide similar services rather than the rate an agency charges its patients.  *Douglas*, 492 Mich at 275.  This is "because [that compensation] helps the fact-finder to determine what the caregivers could receive on the open market." *Id*.

Here, Farmers relies upon a chart from the Federal Bureau of Labor Statistics to justify the rate it pays Mrs. Prendushi's family-caregivers.  That chart outlines the hourly mean and median wages for healthcare workers in plaintiffs' geographic market ranging from personal care aides (approximately $10 an hour) to licensed nurses (approximately $20 an hour).  In response, plaintiffs cite the Feinberg-Rivkin affidavit, which as noted, delineates the tasks of Mrs. Prendushi's caregivers and opines that several of their tasks "fall within the category of a Skilled Nurse," who Feinberg-Rivkin opines, would be paid at a rate of $40 to $60 an hour depending on the services performed.

Farmers claims this affidavit is insufficient because no evidence shows that Mrs. Prendushi actually requires the care of a skilled nurse.  In support, Farmers relies on the January 16, 2014 letter from Mrs. Prendushi's physician indicating that she does not require a Licensed Practical Nurse (LPN) or advanced attendant care at this time.  Farmers asserts that this evidence reveals that payment for a professional nurse's services would be more than the "least expensive adequate means" that Farmers is required to reimburse plaintiffs, *Kitchen v State Farm Ins Co*, 202 Mich App 55, 58; 507 NW2d 781 (1993), and it is therefore not reasonable to compensate the family-caregivers at similar rates.  However, because Farmers presented this evidence in support of its motion in limine rather than at the summary disposition stage, it is not properly before us now.  *Barnard Mfg Co, Inc*, 285 Mich App at 380, citing, among others, *Guarino*, 980 F2d at 404.

But even if we were to consider this evidence, it would not be conclusive in light of Feinberg-Rivkin's opinion that a caregiver, "regardless of classification, i.e., Skilled Nurse, LPN/High Tech Aide or Home Health Aide, is paid the same hourly rate for all care provided" since they are required to be as knowledgeable and available to their patient during their shifts as skilled providers.  Farmers' argument therefore goes to the weight of Feinberg-Rivkin's opinion, which is an argument to be made at trial, not here.  *Skinner*, 445 Mich at 161.

Moreover, Feinberg-Rivkin's opinion is consistent with *Douglas*, which explained that "[i]n determining reasonable compensation for an unlicensed person who provides health care services, a fact-finder may consider the compensation paid to licensed health care professionals who provide similar services." *Douglas*, 492 Mich at 274, quoting *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 164; 761 NW2d 784 (2008) (alteration in *Douglas*).  The emphasis, then, is on the caregiver's services rather than the caregiver's credentials.  See *Bonkowski*, 281 Mich App at 168-169 (allowing a family-caregiver to recover compensation comparable to that of a qualified attendant caregiver where the family-caregiver "provide[d] care consistent with that of a licensed health care professional.").  Consequently, where plaintiffs have presented evidence that at least some of Mrs. Prendushi's caregivers' tasks are akin to those provided by licensed professionals and plaintiffs have established the amount of compensation typically received for those services, a genuine issue of material fact exists on this issue.

## B. MOTION IN LIMINE

This brings us to Farmers' challenge regarding the denial of its motion in limine. Although we review a trial court's decision to admit evidence for an abuse of discretion, we review related preliminary questions of law de novo. *Barnett v Hidalgo*, 478 Mich 151, 158-159; 732 NW2d 472 (2007). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

In raising this issue, Farmers essentially recasts its prior meritless attack on the Feinberg-Rivkin affidavit with one additional wrinkle. Specifically, Farmers asserts that just as the rate an agency charges its patients is irrelevant to the compensation of a family-caregiver, so too are a skilled nurse's wages irrelevant when that family-caregiver lacks a professional licensure. As already noted, however, where similar services are concerned, a fact-finder may consider the compensation paid to licensed care providers in determining a family-caregiver's remuneration. *Douglas*, 492 Mich at 274. This motion in limine was properly denied.

## IV. DOCKET NO. 321511

Finally, Farmers invokes the work-product doctrine in contesting the order requiring production of its entire litigation file. Whether the work-product privilege is applicable and whether it has been waived are questions of law that we review de novo. *Augustine v Allstate Ins Co*, 292 Mich App 408, 419; 807 NW2d 77 (2011). Upon making those determinations, our attention turns towards the trial court's ultimate decision on plaintiffs' discovery motion, which we review for an abuse of discretion. *Id*.

Evidentiary discovery in Michigan is open and broad, provided, among other things, that the information sought is not privileged. MCR 2.302(B)(1); *Reed Dairy Farm v Consumers Power Co*, 227 Mich App 614, 616; 576 NW2d 709 (1998). Privileged information includes direct communications between the attorney and client for legal advice, as well as the related qualified privilege pertaining to written material known as the work-product doctrine. *Augustine*, 292 Mich App at 420. The work-product doctrine protects from discovery " 'any notes, working papers, memoranda or similar materials, prepared by an attorney in anticipation of litigation . . . .' " *Messenger v Ingham Co Prosecutor*, 232 Mich App 633, 636-637; 591 NW2d 393 (1998), quoting *Black's Law Dictionary* (6th ed, 1990), p 1606. The doctrine is codified in MCR 2.302(B)(3)(a), which provides:

> Subject to the provisions of subrule (B)(4) [regarding the discovery of facts and opinion held by experts], a party may obtain discovery of documents and tangible things otherwise discoverable under subrule (B)(1) and prepared in anticipation of litigation or for trial by or for another party or another party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only on a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions,

-13-

or legal theories of an attorney or other representative of a party concerning the litigation.

As MCR 2.302(B)(3) reveals, the work-product privilege is not absolute and must be balanced against an opposing party's showing of substantial need for the materials plus an inability to obtain the information without undue hardship. *Messenger*, 232 Mich App at 638. Even with such a showing, however, only factual and not deliberative work product is discoverable. *Augustine*, 292 Mich App at 421.

Here, in response to plaintiffs' supplemental discovery request for Farmers' entire claims, SIU, and litigation files, Farmers provided a "privilege log." Regarding the litigation file, that log provided only the following: "Entire file not produced pursuant to MCR 2.302(B)(3)(a) for referencing mental impression, conclusion[s], opinions, or theories of a party in anticipation of litigation or for trial and communication subject to attorney-client privilege." The trial court found this response wanting, noting that Farmers had failed to comply with Michigan authority requiring the production of a detailed privilege log.

As a preliminary matter, we note that Michigan law does not *require* a privilege log to accompany the assertion of the work-product privilege; instead Michigan cases have merely acknowledged that federal authority requiring parties to specifically identify the documents allegedly subject to the privilege may guide our interpretation of Michigan's work-product doctrine. *See Koster v June's Trucking, Inc*, 244 Mich App 162, 169; 625 NW2d 82 (2000), citing *Great Lakes Concrete Pole Corp v Eash*, 148 Mich App 649, 656 n 6; 385 NW2d 296 (1986) (noting that "one method" to alleviate the burden of an in camera inspection of volumes of documents in complex litigation is to employ the method of federal courts requiring the production of a privilege log). But federal guidance is not the same as a state requirement.

This is not to say, however, that the trial court could not have ordered a detailed privilege log before conducing an in camera inspection. Indeed, we agree with the trial court that Farmers' assertion of the privilege was "woefully inadequate" where Farmers did nothing more than regurgitate MCR 2.302(B)(3). It is impossible to discern what specifically privileged information Farmers' litigation file contains from that blanket assertion alone. Moreover, while on appeal Farmers relies on Schwab's deposition to support its assertion of the privilege, Farmers did not cite that testimony either in its response to plaintiffs' motion on this matter or during the ensuing motion hearing. In any event, that testimony does nothing more than vaguely describe the contents of the litigation file as containing correspondence and court filings. Thus, even were we to consider that testimony, we are still left without the specific information needed to discern the privileged contents of the litigation file.

Nevertheless, Farmers' failure to adequately describe its litigation file cannot mean that it has categorically waived any privilege it may have. See *D'Alessandro Contracting Group, LLC v Wright*, 308 Mich App 71, 81; 862 NW2d 466 (2014) (the waiver of the work-product privilege must, among other things, be voluntary); *Leibel v Gen Motors Corp*, 250 Mich App 229, 241; 646 NW2d 179 (2002) (the waiver of the related attorney-client privilege must be "an intentional and voluntary act that cannot arise by implication . . . ."). And absent some sort of waiver, MCR 2.302(B)(3)(a) expressly requires a trial court to protect privileged work product from discovery ("the court shall protect").

The fact that Farmers did not waive this privilege does not mean Farmers' generic invocation of it is justified, however. As noted, nothing in either Schwab's deposition or Farmers' blanket denial did anything to "put both plaintiffs and the court on notice regarding the nature of the privileges asserted and the documents to which the alleged privileges applied." *Koster*, 244 Mich App at 170. This is significant, for even in *Koster*—upon which both parties rely—this Court concluded that although the insurance company's court-ordered letter organized the documents at issue into four categories (including communications between counsel and the insurance company, internal communications of the insurance company generated as a result of the advice of counsel, billing information, and information the plaintiffs had agreed not to seek), this was not sufficient to definitively cloak the entire claims file in the work-product privilege. *Id.* at 170-172. It was for this reason that the *Koster* Court remanded that case for the trial court to determine whether the claims file documents were in fact protected under the work-product doctrine in the first instance. *Id.* at 172.

Like *Koster*, this record is insufficient to determine the scope of the work-product doctrine's protection. But Farmers has provided even less information regarding the contents of its litigation file than the insurance company in *Koster*. Accordingly, even before plaintiffs can be required to demonstrate any substantial need or undue hardship, see *id.* (the burden shifts to the party seeking discovery to establish substantial need and undue hardship after the court determines whether the work-product doctrine applies), the trial court must first determine what materials in Farmers' litigation file are subject to the privilege. As *Great Lakes Concrete Pole Corp* instructs, one method may be to order a more detailed privilege log before conducting an in camera inspection. *Great Lakes Concrete Pole Corp*, 148 Mich App at 656 n 6. But whatever method the court chooses, ordering Farmers to categorically produce its litigation file absent a waiver or determination regarding whether the work-product doctrine applies is outside the range of reasonable and principled outcomes under these circumstances.

## V. CONCLUSION

In Docket No. 321348, we affirm the trial court's order denying Farmers' motion in limine. However, we vacate the trial court's summary disposition ruling that plaintiffs' rent is an "allowable expense" and remand for further proceedings on that issue. In all other respects, we affirm the trial court's order denying Farmers' motion for summary disposition. In Docket No. 321511, we reverse the trial court's order requiring Farmers to produce its entire litigation file. On remand, the court should determine which documents (if any) in the file are subject to the work-product privilege and then determine whether plaintiffs have demonstrated the substantial need and undue hardship necessary to obtain access to the factual portions of the litigation file. We do not retain jurisdiction.

No costs, neither party having prevailed in full. MCR 7.219.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Donald S. Owens

-15-